**WILSON & COMPANY, Inc., Petitioner,**

v.

**Ezra Taft BENSON, Secretary of Agriculture of the United States, Respondent.**

**No. 13013.**

United States Court of Appeals
Seventh Circuit.

Feb. 15, 1961.

Louis R. Simpson, Chicago, Ill., Thomas Freeman, Chicago, Ill., for petitioner.

Neil Brooks, Asst. Gen. Counsel, U. S. Department of Agriculture, Washington, D. C., George Cochran Doub, Asst. Atty. Gen., Morton Hollander, Chief, Appellate Section, Civil Division, United States Department of Justice, Washington, D. C., Carl R. Bullock, Atty., United States Department of Agriculture, Washington, D. C., John S. Griffin, Atty., United States Department of Agriculture, Los. Angeles, Cal., for respondent.

Before HASTINGS, Chief Judge,. DUFFY, Circuit Judge, and PLATT, District Judge.

DUFFY, Circuit Judge.

Wilson & Company, Inc., (Wilson) asks us to review and set aside a decision and order of the Judicial Officer [1] of the United States Department of Agriculture. The decision and order concern alleged "discriminatory pricing activities" by Wilson in the period from February, 1956 to and including December, 1956, which activities are claimed to be in violation of section 202(a) and (b) of the Packers and Stockyards Act. 7 U.S.C.A. § 192(a) and 192(b).

There is no dispute that Wilson is a "packer" as that word is defined in the Packers and Stockyards Act. It is admitted that the activities complained of occurred "in commerce" as defined by the Act.

It is provided in section 202(a) and (b) [2] of the Act that " [i]t shall be unlawful for any packer * * * to:

" (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce; or

" (b) Make or give, in commerce, any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject, in commerce, any particular person or locality to any undue or unreasonable prejudice

1. The Judicial Officer acted for the Secretary of Agriculture pursuant to authority delegated to the Judicial Officer. 10 Fed. Reg. 13769; 11 Fed.Reg. 177A–233; 18 Fed.Reg. 3219, 3648; 19 Fed.Reg. 74.

2. The provisions of section 202 of the Act were amended in 1958, 72 Stat. 1749, 7 U.S.C.A. § 192, but the amendment is not relevant as the transactions in this case took place in 1956.

or disadvantage in any respect whatsoever * * *." 7 U.S.C.A. § 192 (a, b).

In the complaint, Wilson was charged with having violated section 202(a) and (b) in that it granted "to certain favored accounts in San Francisco, Oakland and Fresno, California, and adjacent areas, reductions in the prices of meat and meat products not granted to other accounts," and, "accorded preferential handling and special services to such favored accounts and not to other accounts, and supplied such favored accounts with free promotional items not offered or given to other accounts."

In January, 1949, Wilson entered the business of selling meats and meat products to hotels, restaurants and ship lines in the San Francisco area, by purchasing from Ed Heuck the hotel supply business theretofore conducted by him. The business was conducted by Wilson under the name of "Ed. Heuck Company," and Heuck was retained as manager. The volume of business was built to the point where Wilson had 400 accounts in that area, and sold about 100,000 pounds of fabricated meat cuts and similar products each week.

On February 15, 1956, Heuck resigned, and immediately formed his own competing hotel supply business under the trade name of "Reliable Meat Company." Many of the personnel including most of the salesmen who had been associated with him in petitioner's business, left and joined Heuck in his new venture. Wilson's sales dropped to about 35,000 pounds a week. Its former salesmen, upon joining Reliable Meat Company, continued to call on the same accounts which they had previously serviced for Wilson. Only ten or twelve accounts were retained by Wilson and these were mostly steamship lines.

Gene Ray, sales manager of Wilson's Los Angeles hotel supply business, was temporarily assigned to take over the San Francisco operation. Ray reported the business had fallen into a chaotic state. Ray continued in charge until the middle of March, 1956, when he was replaced by George Horton who had held various administrative positions with Wilson.

Wilson decided to stay in the hotel supply business in the San Francisco area, and entered upon a determined effort to regain its lost business and to obtain new business. Wilson continued to operate the Ed. Heuck Company until April 16, 1956, when it was dissolved. Thereafter, Wilson operated its business in the San Francisco area under the name of "Davidson Meat Company," a division of Wilson.

For a number of years, Wilson had issued price lists of their products on Friday of each week, setting forth the prices at which sales were to be made the following week. Although the prices of competing purveyors were not identical, the prices listed by the different purveyors for a single item usually did not vary more than two cents a pound. It was common practice in the area for the purveyors, including Wilson, to authorize their salesmen to reduce the list price by not more than two cents a pound if necessary to meet the price of a competitor. Although price lists were issued each week, the price of individual items often remained constant for a number of weeks at a time.

When Ray took over as Wilson's temporary manager, he continued the practice of issuing price lists. However, he instructed the salesmen that if a two cent reduction in price was not sufficient to obtain a sale, they were to call the office to obtain approval for greater price cuts.

Horton continued the practice, initiated by Ray, of having weekly meetings of salesmen and executive personnel, and instructed the salesmen to go out after the business even if it were necessary to cut prices. During the period under consideration, approval frequently was given for price cuts as great as ten cents per pound.

Wilson was successful in diverting a substantial volume of business from its competitors. The price-cutting policy of Wilson enabled it to increase its business from 38,937 pounds of beef per week in

June, 1956, to 56,803 pounds in August, 1956. However, during the period from April 1 to October 27, 1956, in the San Francisco area, Wilson sold its meat and meat products to hotels, restaurants and ship lines at a loss exceeding $152,000.

In a letter to Wilson dated September 5, 1956 from Wilson's manager in the San Francisco area, it was stated that the Company was aware that it had been "doing nothing but exchanging dollars for the last few weeks." The letter which was sent to the main office in Chicago further said, "As per our telephone conversation of last Saturday, Henry, we explained to you that there are times in our growing process whereas to secure some of the business that is available in this area, we at times do unorthodox things, and things that possibly could not be condoned in a true sense as good business."

Wilson argues that it did not seek to gain a monopoly in the San Francisco hotel supply business. It strongly denies that it sought or attempted to destroy competition. Wilson says that price concessions are usual and common in the industry, particularly in efforts to obtain new accounts. Wilson repeatedly asserts that price cutting to regain lost customers or to gain new customers is not an unfair practice within the meaning of section 202(a) of the Packers and Stockyards Act.

The Secretary of Agriculture points out that Wilson did not have a contract with Heuck whereby he agreed to refrain from engaging in a competing business if he left Wilson's employment. But, even assuming the conduct of Heuck was improper, the Secretary contends it is no defense in this proceeding against Wilson.

Finding 38 states, in part: "The selective price reductions of Wilson in the San Francisco area were drastic, the prices at which it sold some of its products to favored customers were unreasonably low in that products were sold at or below cost to respondent, and about 75 percent of its business, April-October, 1956, was obtained through price cutting.

These price reductions to selected customers bore no realistic relation to respondent's costs or the prices charged by its competitors in the hotel and restaurant supply business in the San Francisco area."

There was also a finding that the discriminatory price reductions by Wilson were not made in good faith to meet the lawful and equally low prices of its competitors, and were not made in respect to surplus inventories or changing market conditions. The Judicial Officer specifically found that the discriminatory price-cutting campaign was waged by Wilson to lessen competition by Reliable Meat Company and other competitors in the San Francisco area. Also, that the acts of respondent diverted substantial business from competitors to itself and adversely affected the hotel and restaurant supply business in the San Francisco area.

The order which Wilson asks to have set aside provides that Wilson "shall cease and desist from discriminating in price between purchasers of meat and meat food products of like grade and quality where the effect of such discrimination may be substantially to lessen competition or tend to injure, destroy or prevent competition with any competitor of Wilson & Company, Inc.: *Provided,* That nothing herein contained shall prevent Wilson & Company, Inc., from discriminating in price where a lower price is made or granted to any purchaser or purchasers in good faith 1) to meet an equally low price of a competitor, or 2) in response to changing conditions affecting the market for or the marketability of meat and meat food products, or 3) to make due allowance for differences in the cost of processing, sale, or delivery resulting from the differing methods or quantities in which such meat and meat food products are to such persons sold or delivered."

The order also required Wilson to keep certain designated records. On this appeal, Wilson does not seek a review of that portion of the order. Charges of the complaint not covered in the order were dismissed.

The Supreme Court has stated a statute "must take meaning from its historical setting." United States v. Henning, 344 U.S. 66, 72, 73 S.Ct. 114, 118, 97 L. Ed. 101. We may note that prior to the enactment of the Packers and Stockyards Act, Congress had enacted certain measures which, in some respects were designed to prohibit monopoly, restraint of trade, or unfair competition, viz., the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note; section 2 of the Clayton Act, 15 U.S.C.A. § 13 prohibiting discriminatory prices; section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45 prohibiting unfair methods of competition in commerce, and section 3 of the Interstate Commerce Act, 49 U.S.C.A. § 3.

The legislative history shows Congress understood the sections of the Packers and Stockyards Act under consideration were broader in scope than the antecedent legislation (61 Cong.Rec. 1805 (1921) ). To illustrate, Representative (later Speaker) Rayburn, emphasized that although Congress gave the Federal Trade Commission wide powers to prohibit unfair methods of competition, such authority is not as wide-ranging as that given to the Secretary of Agriculture under the language in section 202(a) and (b) of the Packers and Stockyards Act. (61 Cong.Rec. 1806(1921) ).

From the legislative history it is a fair inference that, in the opinion of Congress, section 2 of the Clayton Act, section 5 of the Federal Trade Commission Act and the prohibitions in the Sherman Anti-Trust Act were not broad enough to meet the public needs as to business practices of packers. Section 202(a) and (b) was enacted for the purpose of going further than prior legislation in the prohibiting of certain trade practices which Congress considered were not consonant with the public interest.

Generally speaking, it is the national policy to remove artificial restraints from free price competition. However, Congress has determined certain forms of price competition are not in the public interest. "Unfair trade practices and monopolistic methods which in the end destroy competition, restrain trade, and create monopoly have never in all history resulted in benefit to the public interest. On the contrary, for the most part they have been symbolic * * * in the end [of] high prices to consumers and large profits to the owners." H.R.Rep. No. 2287, 74th Cong.2d Sess., p. 17.

Wilson insists that the Secretary's order cannot stand because there is no finding or conclusion that its program of price-cutting was for the purpose of acquiring a monopoly or eliminating a competitor. However, the language in section 202(a) of the Act does not specify that a "competitive injury" or a "lessening of competition" or a "tendency to monopoly" be proved in order to show a violation of the statutory language. To repeat, that section provides it shall be unlawful for any packer to " [e]ngage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce."

There is no requirement in section 202(a) for proof that the hotels and restaurants which were favored by Wilson, competed in the sale of meals to the public with hotels and restaurants which were not so favored.

The language in section 202(a) includes practices which might be a violation of section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act. It was held in Federal Trade Commission v. Anheuser-Busch, Inc., 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385, that there is a violation of section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act when there is a price discrimination which deals the requisite injury to sellers or primary-line competition, although buyers or secondary-line competition are unaffected.

Wilson places great reliance on our decision in Swift & Co. v. Wallace, 7 Cir., 105 F.2d 848. The language relied upon is with reference to section 202(b) of the Packers and Stockyards Act. However, we base our decision in the instant case on our conclusion that Wilson's

price-cutting activities heretofore described were a violation of section 202(a) of the Act.

Wilson attacks the order saying it seeks to enjoin a violation of section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act. Wilson argues the Secretary of Agriculture has no authority to enjoin a violation of that Act. We have heretofore commented that the broad language of section 202(a) would cover activities proscribed by section 2(a) of the Clayton Act. We do not think the fact that Wilson's price-cutting program might have been a violation under some other Congressional enactment in any way destroys the authority of the Secretary of Agriculture in entering the order under the Packers and Stockyards Act which we have here under consideration.

■ Wilson further objects to the general application of the order which would cover its sales of meat and meat food products throughout the United States, when the practices complained of referred only to Wilson's relatively small and local San Francisco hotel supply business.

We would have been better pleased had the order been in a more restricted form. However, it is well established that the nature of sanctions imposed must be left largely to the regulatory agency, and unless there are serious reasons for a limitation in the scope of the order, the courts will not interfere with the determination of the agency in that respect. Federal Trade Commission v. National Lead Co., 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438; G. H. Miller & Co. v. United States, 7 Cir., 260 F.2d 286, 295–297.

We believe that the findings of the Judicial Officer are supported by the record considered as a whole, and that his conclusions have a rational basis in fact and in law.

The petition of Wilson to set aside said order will be denied. The order under review must be and is

Affirmed.