**SWIFT & COMPANY, Petitioner,**

v.

**UNITED STATES of America and Orville L. Freeman, Secretary of Agriculture, Respondents.**

No. 13584.

United States Court of Appeals Seventh Circuit.

Oct. 11, 1962.

850

Arthur R. Curtis, Arthur C. O'Meara, Thomas H. Long, Walter D. Turner, Chicago, Ill., for petitioner.

Neil Brooks, Asst. Gen. Counsel, U. S. Dept. of Agriculture, Washington, D. C., Joseph D. Guilfoyle, Acting Asst. Atty. Gen., Morton Hollander, Chief, Appellate Section, Civil Division, Dept. of Justice, Washington, D. C., Jerome S. Ducrest, Robert E. Duncan, Attys., Dept. of Agriculture, Washington, D. C., for respondents.

Before DUFFY, SCHNACKENBERG and CASTLE, Circuit Judges.

DUFFY, Circuit Judge.

This is a petition to set aside or modify an order issued by the Judicial Officer of the Department of Agriculture,[1] in a proceeding under section 203 of the Packers and Stockyards Act, 7 U.S.C.A. § 193.

[1] The Judicial Officer acts for the Secretary of Agriculture. His decision in this proceeding may be found in 20 Agr.Dec. 1120.

The Judicial Officer found and concluded that Swift & Company purchased livestock in violation of sections 202 and 401 of the Packers and Stockyards Act (7 U.S.C.A. §§ 192 and 221) and the regulations in effect pursuant to the Act.

The order directed Swift & Company to 1) cease and desist from such illegal practices; and 2) to prepare and keep for at least six months, full and complete records of the weights used in the purchase of livestock at its buying stations including computations and allocations of "shrink."

The complaint contained eleven charges involving livestock buying or record-keeping practices at petitioner's Neuhoff Division, Nashville, Tennessee, each with respect to one or more species of livestock at one or more locations in Tennessee, Alabama, Mississippi and Kentucky. Six of the charges were disposed of in petitioner's favor. As to the remaining five charges, the Judicial Officer found violations of the Act by petitioner.

The first four paragraphs of the order relate to four livestock buying practices which were found to be unfair. The fifth paragraph relates to the failure to keep certain livestock buying station records for at least six months. The entire order applies to all species of livestock and to petitioner's livestock buying and record-keeping operations at all of its plants and divisions throughout the United States.

Petitioner denies that the buying practices complained of by the Secretary were unfair or in violation of the Packers and Stockyards Act. It contends that the administrative order applying nationwide with reference to all species of livestock was unreasonable and excessively broad and should be modified. It also lays great emphasis on its contention that it was denied procedural due process in that it did not receive a fair hearing. Petitioner urges the entire order should be set aside because of the alleged failure of due process.

Under the Packers and Stockyards Act, whenever the administrative agency has reason to believe that a packer has violated or is violating the Act, the agency shall serve on the packer a complaint stating the charges and requiring the packer to attend and testify at an administrative hearing. At this hearing, the packer has a right of cross examination and also the right to be heard in person or by counsel and through witnesses.

■ Due process in an administrative hearing, of course, includes a fair trial, conducted in accordance with fundamental principles of fair play and applicable procedural standards established by law. In Morgan v. United States, 304 U.S. 1, 22, 58 S.Ct. 773, 82 L.Ed. 1129, the Court said: "As the hearing was fatally defective, the order of the Secretary (of Agriculture) was invalid."

Petitioner claims it was denied access to government records which it claims were necessary for a full cross examination of Paschal O. Drake, a government investigator in charge of the precomplaint investigation of livestock buying practices in the Nashville area. He was permitted to testify generally as to what was "learned and heard" during these investigations. The hearing examiner accepted this testimony as "background." The Judicial Officer held such testimony had "no probative value" and was not relied upon in support of his findings, conclusions and decision.

Petitioner further claims witnesses were heard out of order; that government investigators were permitted to testify to what subsequently heard government witnesses had told them during precomplaint interviews, and that such testimony was admitted and considered except to the extent "not otherwise corroborated." Also, that the transcript of the sworn statements of certain of petitioner's employees taken in the precomplaint investigation was admitted into evidence and was considered by the examiner and Judicial Officer.

■ The strict common law rules of evidence do not apply to administrative hearings. In Yiannopoulos v. Robinson,

7 Cir., 247 F.2d 655, this Court stated at page 657: " * * * [T]he strict common law rules of evidence do not apply to an administrative hearing and that the admission of incompetent and irrelevant matter is not reversible error, if there is substantial evidence to sustain the decision of the agency."

Again, in Rhodes Pharmacal Company v. Federal Trade Commission, 7 Cir., 208 F.2d 382, this Court pointed out that evidence that would be excluded in an ordinary lawsuit may, under many circumstances, be received on hearings before an administrative agency.

■ "True it is that administrative convenience or even necessity cannot override the constitutional requirements of due process. Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio, 301 U.S. 292, 304, 57 S.Ct. 724, 81 L.Ed. 1093. However, in administrative hearings the hearing examiner has wide latitude as to all phases of the conduct of the hearing, including the manner in which the hearing will proceed." Cella v. United States, 7 Cir., 208 F.2d 783, 789.

■ After a careful examination of the record before us and without discussing in further detail the points raised by petitioner under this heading, we conclude that Swift & Company was not denied procedural due process.

■ The Neuhoff Division of Swift & Company was located in Nashville, Tennessee. It served as a major outlet for an area located in the states of Tennessee, Mississippi, Kentucky and Alabama. In recent years, in this area, there has been a large increase in the percentage of livestock sold in country auction markets. Scotts Hill Auction Company market was such a market and was located in Scotts Hill, Tennessee.

David Askins was a country dealer at Scotts Hill Auction Company market. In 1955 and 1956, he regularly purchased a large number of hogs and other livestock in this market. When hogs were received at this market, they were separated into groups identified as "tops," "heavy" or "light." The top grade hogs were separated from the others and sold, all at one time. There was a substantial market for top grade hogs.

In the spring of 1955, a buyer-employee of Swift & Company started going to the Scotts Hill Auction Company market. Competition developed between Swift & Company and Askins resulting in an increase in the prices paid to farmers for top hogs. Before the competition started, Askins had been buying top grade hogs at fifty cents under the Nashville market. However, after Swift & Company began buying and bidding against Askins, the price went up to twenty-five cents or thirty cents over the Nashville market.

Askins and the buyer for Swift & Company entered into an agreement that Askins would buy all the top grade hogs at the Scotts Hill market and would furnish from such purchases to the Neuhoff Division of Swift & Company whatever quantity of top grade hogs Swift & Company wanted, at the same price at which Askins had purchased them plus trucking charges.

During the three months when this agreement was in effect, Askins purchased 1392 top grade hogs and 729 of them were delivered to the Neuhoff Division of petitioner at the same price at which they had been purchased by Askins plus a trucking charge for hauling the hogs from Scotts Hill to petitioner's plant at Nashville.

A similar buying arrangement was in effect for five months beginning March 1, 1956. In that year, Swift & Company was billed directly by the Scotts Hill market for the purchase price of the hogs turned over to it by Askins, whereas in 1955, Askins paid the market for the hogs and was later reimbursed by Swift & Company.

The prohibitory provisions of section 202 of the Act, 7 U.S.C.A. § 192, were amended on September 2, 1958. The transactions referred to in this case took

place prior to that date. However, the language before and after September 2, 1958, prohibiting certain practices by packers and which are involved in this case, remained substantially the same.

Section 202 provides:

"It shall be unlawful with respect to livestock * * * for any packer * * * to:

"(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce; or

"(b) Make or give, in commerce, any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject, in commerce, any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever; or

\* \* \* \* \* \*

"(d) * * * [B]uy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices in commerce, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article in commerce, or of restraining commerce; or

"(e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices in commerce, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article in commerce, or of restraining commerce; or

"(f) Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business in commerce, or (2) to apportion purchases or sales of any article in commerce, or (3) to manipulate or control prices in commerce; or

"(g) Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a)–(d), or (e) of this section." 7 U.S.C.A. § 192.

Petitioner urges that for it to be unfair in violation of sec. 202(a), a packer practice must be either one contrary to good morals because characterized by deception, fraud, bad faith or oppression, or (2) against public policy because of a dangerous tendency unduly to hinder competition or create monopoly.

The legislative history showed Congress understood the sections of the Packers and Stockyards Act under consideration were broader in scope than antecedent legislation such as the Sherman Antitrust Act, sec. 2 of the Clayton Act, 15 U.S.C.A. § 13, sec. 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45 and sec. 3 of the Interstate Commerce Act, 49 U.S.C.A. § 3. Wilson & Company, Inc. v. Benson, 7 Cir., 286 F.2d 891, 895.

An agreement among packers to eliminate competition was held illegal under the Sherman Antitrust Act in Swift & Company v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518. It was held in that case that the "defendants cannot be ordered to compete, but they properly can be forbidden to give directions or to make agreements not to compete." 196 U.S. at page 400, 25 S.Ct. at page 281.

We hold the agreement between competitive buyers to split or share the purchase of top grade hogs as was done by petitioner and Askins at Scotts Hill market constituted a violation of sec. 202 of the Act. The essential nature and the necessary result of this arrangement or practice was to eliminate competition.

Another practice condemned by the Judicial Officer as a violation of sec. 202 of the Act and sec. 201.69 of the Regulations, was the practice of country dealers telephoning the Neuhoff Division of Swift & Company to obtain information as to the price which Swift & Company would pay for various groups and types of livestock. The dealers would receive this information prior to the time they

made their purchases. Swift & Company paid the quoted price even though the market might have fluctuated downward between the time of the quotation of the price and the delivery of the livestock at Swift & Company's plant in Nashville, which usually was the same day. We think the so-called guarantee is actually no more than an offer to buy subject to acceptance by delivery within a specified or understood time.

The dealers in question did not deal exclusively with Swift & Company, but also obtained quotations from and purchased for resale to other packers. Furthermore, dealers purchasing at such markets and hoping to resell to Swift & Company, and not knowing what price they would receive, probably would have operated more conservatively and of necessity paid less than they did pay because of the firm offer previously received from Swift & Company. A legitimate caution would demand that they have a larger cushion where the price at which they could sell the livestock was unknown.

The Secretary claims that such practice eliminated competition, but under the Regulation, the dissemination of price information to country dealers is not illegal *per se*. It is illegal only if made "for the purpose of restricting or limiting competition, manipulating livestock prices, or controlling the movement of livestock. * * *" There is no evidence in this record and no finding that the purpose of dissemination of price information by Swift & Company was any other than to consummate a sale. The Secretary's argument that quoting prices to dealers eliminated competition because "[T]here is a 'disposition of men "to follow their most intelligent competitors", especially when powerful' " is dispelled by the Judicial Officer's own finding of fact that frequently it was necessary for the country dealers to call Swift & Company a second time and, if possible, obtain a higher price quotation because the dealer was unable to buy at the price which had originally been quoted.

We hold that paragraphs 1 and 2 of the order of the Judicial Officer should be eliminated.

Swift & Company urges the order entered is unnecessarily and unreasonably broad; that it applies nationwide to all of petitioner's plants although the evidence received and the findings of fact by the Judicial Officer are limited entirely to the operation of its Neuhoff Division. Petitioner urges that any order entered should be limited in its entirety to the operation of its Neuhoff Division in Tennessee, Alabama, Kentucky and Mississippi.

We adopt as pertinent, a statement from our opinion in Wilson and Company, Inc. v. Benson, 7 Cir., 286 F.2d 891, 896: "We would have been better pleased had the order been in a more restricted form. However, it is well established that the nature of sanctions imposed must be left largely to the regulatory agency, and unless there are serious reasons for a limitation in the scope of the order, the courts will not interfere with the determination of the agency in that respect."

Petitioner objects to the part of the order requiring it to keep for at least six months, records of weights used in the purchase of livestock. It also objects to the part of the order requiring petitioner to desist from employing as agents, owners of market agencies and certain others designated. We have carefully considered these objections but have decided such parts of the order may stand.

We believe that except for the first two paragraphs of the order, the findings of the Judicial Officer are supported by the record as a whole, and that his conclusions have a rational basis in fact and in law.

The petition of Swift & Company to set aside the order of the Secretary of Agriculture entered on November 28, 1961, will be granted as to the first two paragraphs of the order, but in all other respects must be and is hereby

Denied.