**SWIFT & COMPANY, Petitioner,**

v.

**UNITED STATES of America and Orville Freeman, Secretary of Agriculture, Respondents.**

**AMERICAN STORES COMPANY, now known as Acme Markets, Inc., Petitioner,**

v.

**UNITED STATES of America and Orville Freeman, Secretary of Agriculture, Respondents.**

**Nos. 15787, 15790.**

United States Court of Appeals Seventh Circuit.

April 1, 1968.

**250**

Arthur C. O'Meara, Arthur R. Curtis, Charles R. Kerr, Chicago, Ill., for petitioner Swift & Co.

William I. Aitken, Richard W. Smith, Lincoln, Neb., A. E. Gilfillan, Philadelphia, Pa., for petitioner American Stores Co., whose correct name is now Acme Markets, Inc.

Neil Brooks, Asst. General Counsel, Robert E. Duncan, Harold M. Carter, U. S. Department of Agriculture, Washington, D. C., Edwin L. Weisl, Jr., Asst. Atty. Gen., Morton Hollander, Chief Appellate Section, Civil Division, Department of Justice, Washington, D. C., for respondent.

Before SCHNACKENBERG, CASTLE and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

In these two cases, Swift & Company and American Stores Company (now Acme Markets, Inc.) have petitioned to obtain review of a cease and desist order of the Judicial Officer of the United States Department of Agriculture representing the Secretary of Agriculture.[1] The order was issued in an administrative proceeding under the Packers and Stockyards Act (7 U.S.C. § 181 et seq.). Both petitioners are concededly packers engaged in interstate commerce and within the purview of that Act. The Judicial Officer found that during 1958–1960 they engaged in an unlawful business practice, prohibited by Section 202 (a)[2] of the Act and Section 201.70 of the Regulations,[3] by having qualified buyers in the Western Slope lamb marketing area near Craig and Montrose, Colorado, but refraining from bidding on fat lambs against that area's principal dealer, Harry Heath & Son, and purchasing them in substantial quantities from that dealer-competitor instead of from the producers.

In the *Swift* case, the Judicial Officer also concluded that Swift had an agreement with Perry Holley Company, a competitor and registered dealer, as to the highest prices to be paid to lamb producers in the Craig, Colorado, marketing area during the 1959 marketing season,

---

1. The cases were briefed separately but consolidated for purposes of hearing on appeal. In view of the similarity of the issues, both cases are disposed of in this opinion.

2. With respect to livestock, Section 202(a) of the Packers and Stockyards Act makes it unlawful for any packer to:
    "(a) Engage in or use any unfair * * * practice * * * in commerce * * *" (7 U.S.C. § 192(a)).

3. Section 201.70 of the Regulations provides:
    "Each packer and dealer engaged in purchasing livestock in person or through employed buyers, shall conduct his buying operations in competition with, and independently of, other packers and dealers similarly engaged" (9 C.F.R. § 201.70).

in contravention of Section 202(f) of the Packers and Stockyards Act.[4]

At the hearings conducted by a Hearing Examiner appointed under the Administrative Procedure Act (5 U.S.C. § 500 et seq.), 28 lamb producers, about one-fourth of those in the Western Slope lamb marketing area, testified about marketing conditions there from 1958 to 1960. After hearing their testimony and the testimony of other witnesses, and after receiving voluminous exhibits, the Hearing Examiner rendered his report, concluding, *inter alia*, that Swift and American Stores had violated the Act and Regulations as previously specified. He recommended that a cease and desist order should be issued to prohibit the illegal practices of Swift and American Stores.

A year after the Hearing Examiner's report was rendered, the Judicial Officer, representing the Secretary of Agriculture, in turn entered findings and conclusions approving the pertinent part of the Hearing Examiner's report. He found that the Western Slope of Colorado, near Craig and Montrose, is one of the western states' lamb production areas. Fat lambs are those that have acquired sufficient fat for meat production; those that require further feeding are the feeders. The annual Western Slope marketing season for lambs, both fats and feeders, is from mid-August to mid-October.

Both petitioners purchased for slaughter fat lambs in the Craig and Montrose areas and employed salaried lamb buyers there. However, during 1958–1960, these petitioners refrained from bidding against Harry Heath & Son, a competitor and registered dealer, for fat lambs offered by producers in those areas. Heath, the principal dealer in the area, bought the fat lambs from the producers, it was found, without competition from Swift and American Stores. They then satisfied their Western Slope requirements for lambs by purchasing from Heath.

During 1959 and 1960, Swift purchased 55,619 fat lambs in the Western Slope area, with 83.1% coming from Harry Heath & Son. During 1958–1960, American Stores purchased 62,927 Western Slope fat lambs, 82.8% coming from Harry Heath & Son.

The Judicial Officer determined that petitioners did not compete with Harry Heath & Son in the purchase of fat lambs from Western Slope producers and that the natural effect was lower producer prices. The practice of petitioners in having their on-the-scene buyers refrain from bidding against Heath while afterwards acquiring fat lambs from Heath was concluded to be an unfair practice within the meaning of Section 202(a) of the Act, and in violation of Section 201.70 of the Regulations (notes 2 and 3, supra).

Based on a conversation between Swift's buyer Forrest Taylor and Perry Holley, the Judicial Officer also found that Swift and Perry Holley Company, a competitor and registered dealer, had agreed on maximum prices to be paid producers for lambs in the Craig area in the 1959 marketing season. This agreement was concluded to violate Section 202(f) of the Act (note 4, supra).

Swift and American Stores were ordered to cease and desist from

"(1) entering into any agreement or arrangement with a dealer in lambs to refrain from competing against the dealer in the purchase of lambs offered for sale by lamb producers in commerce, or (2) failing to compete generally in the purchase of lambs in commerce from producers on any market or in any lamb marketing area where it has a qualified lamb buyer or buyers present and instead acquiring a substantial percentage of its lambs on

4. Section 202(f) of the Packers and Stockyards Act provides that with respect to livestock, it is unlawful for any packer to:

"(f) Conspire, combine, agree, or arrange with any other person * * * to manipulate or control prices in commerce * * *" (7 U.S.C. § 192(f)).

such market or in such marketing area from a dealer or dealers without so competing."

Swift was also ordered to cease and desist from

"(3) entering into any agreement or arrangement with any other person or persons with respect to prices to be paid for lambs."

■ Petitioners first argue that they were denied due process of law because they were not charged with an unfair buying practice but only with agreements not to compete with Heath as to purchasing Western Slope fat lambs. As petitioners knew, the Department of Agriculture explained to Harry Heath & Son long before these hearings closed that it would be an unlawful practice for a dealer to maintain a non-competitive relationship with other buyers whereby the dealer would be "purchasing substantial numbers of sheep or lambs 'on order' for any packer or dealer in any lamb producing or feeding area where such packer or dealer is competitive * * through its own buyer." Also, the answers filed in the administrative proceedings and the briefs here indicate that they knew they were charged with such an unlawful buying practice. This was also shown by the testimony at the hearings and by petitioners' own proposed findings. Accordingly, they were "reasonably apprised of the issues in controversy." Cella v. United States, 208 F.2d 783, 789 (7th Cir. 1953), certiorari denied, 347 U.S. 1016, 74 S.Ct. 864, 98 L. Ed. 1138. Since this issue was tried by the Hearing Examiner, the complaint can be deemed *pro tanto* amended. Associated Home Builders of Greater East Bay, Inc. v. National Labor Relations Board, 352 F.2d 745, 753–754 (9th Cir. 1965). As the case unfolded, there was "a reasonable opportunity to know the claims of the opposing party and to meet them," so that the fundamental requirements of due process were met. Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129; J. B. Williams Company v. Federal Trade Commission, 381 F.2d 884, 888 (6th Cir. 1967).

■ Petitioners' argument resembles that advanced in Armand Company v. Federal Trade Commission, 84 F.2d 973 (2d Cir. 1936), certiorari denied, 299 U.S. 597, 57 S.Ct. 189, 81 L.Ed. 440. There the Armand Company and others were charged in an administrative complaint with a conspiracy, but there was no finding by the Federal Trade Commission that the conspiracy existed. Nevertheless, the Commission ordered the manufacturing company to stop certain practices. Despite the claim of variance between the complaint and the cease and desist order, the court held (84 F.2d at p. 975):

"The manufacturer called upon to justify such a course of dealing is advised of what he has to meet, and the divergence between the charge framed as a joint wrong and as single is utterly unimportant. If, during the course of the prosecution, he could show any reason why it was important to make the formal adjustment, conceivably it might be error to refuse to do so; but to hold, after all had gone through without question, that it had been only a dance of marionettes, would be to go back at least two centuries."

Similarly, since there has been no showing that these petitioners were prejudiced, any variance between this complaint and order is not fatal. National Labor Relations Board v. Fant Milling Company, 360 U.S. 301, 308–309, 79 S.Ct. 1179, 3 L.Ed.2d 1243; Cella v. United States, 208 F.2d 783, 789 (7th Cir. 1953), certiorari denied, 347 U.S. 1016, 74 S.Ct. 864, 98 L.Ed. 1138.

■ Swift also asserts that the complaint fails to charge that it had a price agreement with the Perry Holley Company. Paragraph II(b) of the complaint charged Swift with agreeing with Wilson & Company, Inc. concerning prices to be paid for lambs in the Craig, Colorado, area during the 1958–1960 lamb seasons. As to lamb-buying operations, Holley was described in Paragraph II(h) of the complaint as under the direction of Wilson. It is the Government's theory that, taken together, these two paragraphs suffi-

ciently apprised Swift that it was charged with an unlawful price agreement with the Perry Holley Company.

During the hearings, Swift questioned its Craig area buyer as to whether he had any price-fixing agreement with Perry Holley for fat lambs on the Western Slope. Swift also questioned other witnesses about such a price agreement, so that it certainly comprehended the presence of this charge. Any ambiguity on this point is dispelled by Swift's proposed findings, after hearing the evidence of a Swift-Holley price-fixing agreement and no other such agreement, to the effect that there was no evidence that Swift entered into any agreement "with any other respondent [including Holley] or other person regarding prices to be paid for live lambs in Western Colorado." In the absence of prejudice or surprise, Swift's Fifth Amendment argument must be rejected. See 1 Davis, Administrative Law Treatise, § 8.04.

■ Petitioners' principal argument is that the Packers and Stockyards Act does not interdict their refusal to purchase fat lambs from producers while confining most of their Western Slope purchases to dealer Harry Heath & Son. Under the Sherman Act, it is true that a simple refusal to deal is permissible. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992; United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505. However, the statutory prohibitions of Section 202 of the Packers and Stockyards Act are broader and more far-reaching than the Sherman Act or even Section 5 of the Federal Trade Commission Act. Swift & Company v. United States, 308 F.2d 849, 853 (7th Cir. 1962). Section 202(a) of the Act does not require the Government to prove injury to competition. Wilson & Company v. Benson, 286 F.2d 891, 895

(7th Cir. 1961). The Act is remedial legislation and is to be construed liberally in accord with its purpose to prevent economic harm to producers and consumers at the expense of middlemen. Stafford v. Wallace, 258 U.S. 495, 521, 42 S.Ct. 397, 66 L.Ed. 735; Safeway Stores, Inc. v. Freeman, 125 U.S.App. D.C. 175, 369 F.2d 952, 956 (1966).

■ Our review of the evidence shows that there is ample support in this record for the Judicial Officer's conclusion that Section 202(a) of the Act and Section 201.70 of the Regulations were violated.[5] Both petitioners had salaried buyers in the Western Slope area during 1958–1960, when Harry Heath & Son, a dealer buying and selling livestock for his own profit, was the chief purchaser of lambs there. During these years, petitioners purchased only a small number of fat lambs directly from the Craig and Montrose producers and purchased most of their Western Slope requirements from dealer Harry Heath & Son.

■ Various Western Slope producer witnesses offered their fat lambs to all prospective purchasers and actively solicited bids. None received a bid from Donald S. Couch, American Stores' buyer, during this period. Forrest Taylor, Swift's buyer, made only one bid and purchased only one band of lambs during the same time. The record also showed that producers' prices for fat lambs were depressed, and that producers' sales of fat lambs to Harry Heath & Son were without competition from petitioners. In 1959 and in 1960, Swift purchased 83.1% of its Western Slope fat lambs from Heath. During the entire 3-year period, American Stores purchased 82.8% of its Western Slope fat lambs from Heath. During the same interval, Heath was the buyer of the largest number of fat lambs in this area, having pur-

5. Apart from our conclusion that the unilateral refusals to buy from producers in the setting of these cases violated Section 202(a) of the Packers and Stockyards Act and Section 201.70 of the Regulations, petitioners' failure to compete with Heath in their purchases of substantial numbers of fat lambs from Heath could be viewed as a combination between petitioners and Heath within the meaning of Section 202(f) of the Act. Cf. Albrecht v. Herald Company, 390 U.S. 145, 88 S. Ct. 869, 19 L.Ed.2d 998.

chased 224,577 fat lambs directly from the producers. If petitioners had purchased their Western Slope fat lambs independently of Heath, their additional competition could have resulted in higher prices to the producers. The lack of competition between buyers, with the attendant possible depression of producers' prices, was one of the evils at which the Packers and Stockyards Act was directed. Meat Packer Legislation hearings before the House Committee on Agriculture, 66th Cong., 2d Sess., pp. 22, 229, 250, 303, 1047, 2284 (1920).

■ Both petitioners purchased substantial quantities of fat lambs in the Western Slope area, and they must have usually paid Harry Heath & Son higher prices than that firm paid to the producers. The Judicial Officer considered that petitioners would hardly choose this expensive and indirect way of purchasing their Western Slope fat lambs except for the depressed prices to producers flowing from petitioners' lack of competition with Heath. Thanks to these buying practices, the only willing buyer of the fat lambs resold to petitioners was Harry Heath & Son, so that the producers could hardly obtain full market value for their livestock. Such buying practices were among those outlawed by the Packers and Stockyards Act. Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735.

American states that the reason it avoided buying from producers was in order to obtain its own "sort" of lambs between feeders and fat lambs, but even when the "sort" was in the Montrose stockyard, the dealers would do their own sorting. We were not directed to any record testimony showing that American would obtain a more desirable "sort" by buying fat lambs from dealers instead of producers.

Both petitioners rely on Swift & Company v. United States, 308 F.2d 849 (7th Cir. 1962), as holding that refusals to purchase from producers are legal. Their reliance on that case is misplaced, for this Court did not consider that question when it approved the country dealers' practice of telephoning Swift to determine the price which Swift would pay them for livestock. Furthermore, that case involved Section 201.69 of the Regulations proscribing the furnishing of buying information,[6] whereas this case involves Section 201.70 of the Regulations, requiring packers and dealers to conduct their buying operations "in competition with, and independently of, other packers and dealers similarly engaged." Finally, the opinion evidence in that case would not support a conclusion that Swift's Nashville buying operations violated Section 202(a) of the Act and Section 201.70 of the Regulations. In contrast, this record reveals anti-competitive behavior that was deemed responsible for the depressed prices in the area. On this record, we cannot say there was no rational basis for the administrative determination that these buying practices transgressed the Act and applicable regulation.

As held in Farmers' Livestock Commission Co. v. United States, 54 F.2d 375, 379 (statutory 3-judge court, E.D.Ill. 1931), an individual refusal to buy may be within the prohibitions of the Packers and Stockyards Act. More recently, it was held that such a refusal violates the Act if "without reasonable cause." Capitol Packing Co. v. United States, 350

---

6. Section 201.69 (9 C.F.R. 201.69) provides:

"FURNISHING INFORMATION TO COMPETITOR BUYERS. No packer, dealer, or market agency, in connection with transactions subject to the provisions of the act, shall, in person, or through employed buyers, for the purpose of restricting or limiting competition, manipulating livestock prices, or controlling the movement of livestock,

prior to, or during the conduct of, his buying operations: (a) furnish competitor packers, dealers, market agencies, or their buyers or representatives, similarly engaged in buying livestock, with information concerning his proposed buying operations, such as the species, classes, volume of livestock to be purchased, or prices to be paid; or (b) furnish any other buying information to competitor buyers."

F.2d 67, 80–81 (10th Cir. 1965). Applying the rule of reason to these facts, the Judicial Officer could and did conclude that the natural effect and apparent purpose of Swift's and American Stores' buying practices were to restrict and lessen competition in the purchase of fat lambs from producers to the detriment of the producers, and that such practices were "unfair" to the lamb producers in the Craig-Montrose area. The determination that petitioners' buying practices were unreasonable has ample support in the record. Nothing in the presentation here warrants a contrary conclusion.

Petitioners admit that if there were agreements between American Stores and Heath and between Swift and Heath to refrain from competing with that dealer in the purchase of fat lambs in the Craig-Montrose area, there would be a violation of Section 202(a) of the Act and Section 201.70 of the Regulations (notes 2 and 3, supra). Nevertheless, they contend that Clause (1) of the order requiring them to cease and desist from such agreements should be set aside on the ground that there was no evidence to support the Judicial Officer's finding of such agreements. Obviously Heath, the largest purchaser of Western Slope fat lambs, could not continue in business unless ordinarily paid a markup by petitioners over the prices Heath paid producers for their fat lambs. Except for the low prices received by producers, possibly caused by petitioners' failure to compete with Heath, the Judicial Officer could infer that otherwise it would have been cheaper for petitioners to buy fat lambs from the producers through their own buyers stationed in that area.

■ As stated in Interstate Circuit v. United States, 306 U.S. 208, 221, 59 S.Ct. 467, 472, 83 L.Ed. 610:

"As is usual in cases of alleged unlawful agreements to restrain commerce, the Government is without the aid of direct testimony that the [accused businesses] entered into any agreement with each other * * *. In order to establish agreement it is compelled to rely on inferences drawn from the course of conduct of the alleged conspirators."

Even in a criminal antitrust case, where the Government's burden of proof is greater than here, a "unity of purpose" or "common design and understanding" is enough to establish a violation. American Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575. Guided by such principles, we hold that the unusual business practices shown by this record and previously discussed herein in some detail were sufficient to support the Judicial Officer's inference of an agreement (Cardillo v. Liberty Mutual Ins. Co., 330 U.S. 469, 477–478, 67 S.Ct. 801, 91 L.Ed. 1028) so that Clause (1) of the order was proper.

■ Swift contends that there is no substantial evidence of an agreement between it and Perry Holley Company as to the maximum prices to be paid for fat lambs in 1959 in the Craig, Colorado, marketing area. However, Gordon Winn, a lamb producer in that area, testified that Swift buyer Forrest Taylor told Winn of Taylor's telling Perry Holley that the 1959 top price for fat lambs was to be $19.50, "and I don't mean $19.51," and that Holley said that was OK. This Winn-Taylor conversation was corroborated by another witness. In spite of an inconclusive denial by Taylor, the Hearing Examiner was entitled to believe Winn and the other witness. This credibility finding will not be disturbed. Cella v. United States, 208 F.2d 783, 788 (7th Cir. 1953), certiorari denied, 347 U.S. 1016, 74 S.Ct. 864, 98 L.Ed. 1138.

■ Under Section 202(f) of the Act, it is unlawful for a packer to agree with any other person on livestock prices, whether or not the price-fixing agreement is carried out. Cf. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 219–220, 60 S.Ct. 811, 84 L.Ed. 1129. Therefore, Swift's defense based on the asserted failure of any Holley-Swift price-fixing agreement cannot be accepted.

256

■ Finally, claiming vagueness and obscurity, both petitioners object to Clause (2) of the cease and desist order. Clause (2) provides that the petitioners shall cease and desist from:

"(2) failing to compete generally in the purchase of lambs in commerce from producers on any market or in any lamb marketing area where it has a qualified lamb buyer or buyers present and instead acquiring a substantial percentage of its lambs on such market or in such marketing area from a dealer or dealers without so competing."

This clause is directed at the unlawful business practices that petitioners conducted with Harry Heath & Son in the Western Slope area of Colorado. It is to be read with reference to the findings and in light of the language used by the Judicial Officer and in the light of the record.

■ The three particular phrases selected from Clause (2) as being unduly vague and obscure are "compete generally," "substantial percentage" and "marketing area." In the setting of this case "compete generally" refers to petitioners' failure to purchase fat lambs directly from producers, purchasing them instead from a competitor in areas where petitioners' own buyers are stationed. So construed as directed against petitioners' unfair buying practices, the term is not impermissibly vague.

■ The phrase "substantial percentage" in the order must also be construed in the light of the record. We construe the phrase as meaning that where petitioners have buyers stationed in a lamb-marketing area, they must purchase fat lambs from producers through those buyers except for such insignificant purchases from dealers that prices to producers could not be affected, unless they can show the Secretary compelling reasons for purchasing through dealers. See United States v. E. I. du Pont De Nemours & Co., 353 U.S. 586, 593–596, 77 S.Ct. 872, 1 L.Ed.2d 1057; Brown

Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510; United States v. Philadelphia National Bank, 374 U.S. 321, 362–366, 83 S.Ct. 1715, 10 L.Ed.2d 915.

■ As to "marketing area," the record reveals the various marketing areas for fat lambs. To accomplish its prophylactic effect, the administrative order need not be confined to the very territory where the offense occurred and therefore this order need not be limited to the Western Slope of Colorado area. Swift & Company v. United States, 308 F.2d 849, 854 (7th Cir. 1962); cf. Lloyd A. Fry Roofing Co. v. Federal Trade Commission, 371 F.2d 277, 284, 286 (7th Cir. 1966).

■ Swift also assails Clause (3) of the order requiring it to cease and desist from "(3) entering into any agreement or arrangement with any other person or persons with respect to prices to be paid for lambs." Swift states that this clause proscribes "agreements as to a bona fide purchase price * * * wherein Petitioner [Swift] is actually negotiating the purchase of lambs." However, the order certainly does not preclude or interfere with normal purchases or negotiations, but is intended to reach only anticompetitive agreements that "manipulate or control prices in commerce" (7 U.S.C. § 192(f)). The order does not forbid bona fide negotiations for the purchase of lambs.

■ If petitioners are in doubt as to the scope of the order, they may seek binding advice from the Department of Agriculture as to its applicability. Federal Trade Commission v. Colgate-Palmolive Company, 380 U.S. 374, 394, 85 S.Ct. 1035, 13 L.Ed.2d 904.

We have considered subsidiary arguments raised by petitioners but deem them unpersuasive.

The motions to strike portions of the Government's appendix are denied and the petitions will be dismissed. The Judicial Officer's order is affirmed.