**MARRIOTT CORPORATION, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 13012.**

United States Court of Appeals Fourth Circuit.

Argued June 13, 1969.

Decided Oct. 23, 1969.

---

Robert Lewis, Martin F. Payson, and R. Bret Mintz, New York City, for petitioner.

Arnold Ordman, Dominick L. Manoli, Marcel Mallet-Prevost, Robert A. Giannais, and Susan Sherman, for respondent.

Before BRYAN, BUTZNER, and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

Marriott Corporation seeks review of a decision and order of the National Labor Relations Board, and the Board cross-petitions for enforcement. Marriott Corp., 172 N.L.R.B. No. 220 (1968). The Board adopted, with certain modifications, the recommendations of a hearing examiner, who found petitioner guilty of unfair labor practices under Sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act. 29 U.S. C.A. § 158 (1965). The Board's order directed the petitioner to cease and desist from certain practices (threats and interrogations of employees) and to take the affirmative actions of reinstating an employee, Luis Lopez, and posting appropriate notices. We deny enforcement of the order requiring reinstatement of Lopez and otherwise affirm the order of the Board.

At the hearing before the trial examiner, Marriott sought, and was denied, permission to use a tape recorder to take live testimony. Counsel for Marriott explained to the examiner that the use of tape recorders had become commonplace in labor proceedings [1] and established that in no other practicable way could a daily transcript be obtained. The examiner stated that he considered the use of such a device an "imposition" and that he could "see no reason for it actually,

---

1. Petitioner cited cases before the Board in which counsel had been permitted to use tape recorders, Record at 4, 5. Tape is also now generally used in the federal courts—both trial and appellate.

particularly if General Counsel objects." We think that court and administrative proceedings ought to be brought, however reluctantly, into the 20th century. Tape is especially appropriate for the recording of live testimony where credibility is often an issue. Perhaps in an appropriate case the Board might benefit from listening to brief excerpts for intonation and inflection that cannot appear in the typed record. Aside from such radical usage, however, it is enough, we think, that counsel wants it for a daily record and will pay for it.

General Counsel object to the use of tape on the ground that it might frighten or adversely affect witnesses. We think a tape recorder no more intimidating than a stenotype machine or a person mumbling inaudibly into a mask. Improper use of the tape is another matter—*e. g.*, playing of the tape over the radio or plant loudspeaker to embarrass a witness—but the trial examiner may, of course, reasonably condition the use of a tape recorder to avoid abuse.

■ We recognize that a trial examiner has wide latitude in conducting the hearing and controlling it. Swift & Co. v. United States, 308 F.2d 849 (7th Cir. 1962). If counsel's use of tape should interfere with or slow down the hearing the examiner could unquestionably correct the situation. He is not at the mercy of the machine, and he need not delay testimony while tapes are changed or repairs effected. Therefore, to the extent that electronic tape may be used without interfering with or slowing down the hearing, we think refusal of permission is arbitrary and capricious.

In the peculiar fact context of this case we need not decide two subsidiary questions presented by the examiner's inexplicable refusal to permit taping:

(1) Is the burden on Marriott to show prejudice resulting from denial of the use of tape or is it on the Board to show the absence of it?

(2) Was Marriott prejudiced in presenting its case, and, if so, should enforcement of the Board's order be denied for failure to grant a fair hearing within the meaning of 5 U.S.C.A. § 706 (1967)?

It is unnecessary to decide these questions because this case does not, we think, turn on close questions of credibility and conflicting evidence.

■ The propriety of the Board's general order [2] is beyond debate on this record. Neither a daily transcript nor the most skillful cross examination of witnesses could explain away the numerous instances cited by the examiner of employee interrogation and interference with collective bargaining.[3]

■ If there is evidence of numerous and pervasive violations of the Act, the Board is empowered to frame an order broad enough to encompass other violations, so long as they resemble those the employer has committed or the danger of their commission in the future can be anticipated from the employer's conduct in the past. NLRB v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930 (1941); NLRB v. Kingwood Mining Co., 404 F.2d 348 (4th Cir.1968)

The other aspect of this case, the discharge of Lopez, likewise turns not on

2. The Company was ordered to cease and desist from:
  \* \* \* \* \*
  (d) *In any other* manner interfering with, restraining, or coercing employees in the exercise of their right to self-organization, to form labor organizations, to join or assist Local 71, Transportation, Terminal, Interplant & Commissary Food Employees Union, affiliated with Hotel, Restaurant Employees & Bartenders, International Union, AFL–CIO, International Association of Machinists and Aerospace Workers, AFL–CIO, or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, or to refrain from engaging in such activities. Trial Examiner's Decision at 28; Marriott Corp., 172 N.L.R.B. No. 220 at 3. (emphasis added).

3. *See, e. g.*, Record at 58, 91, 97, 193.

credibility of conflicting testimony, but upon misapprehension of what indisputably occurred. It was established beyond argument that Lopez was accident-prone—sufficiently so that he may be fairly characterized as a menace to passenger traffic at LaGuardia Airport.

Even if we discount entirely five of the accidents disclosed by the record to be of questionable probative value here [4], there remain four vehicle accidents for which he bears total or partial responsibility. Two of these accidents occurred before Lopez started driving, while he was engaged in the capacities of truck helper and food equipment handler, respectively. Record at 630, 632, 633. In these jobs he was responsible for guiding the truck driver in maneuvering the vehicle under certain circumstances. He was not directing the driver as he should have been when the two accidents occurred. In one accident his truck hit an aircraft, and in the other accident the truck backed into another vehicle. As for the two accidents in which he was driving, one occurred on March 4, 1967, when he backed into another vehicle, and one occurred on March 22, 1967, when he hit a pole. The last driving accident was the one for which he was allegedly fired. Record at 636, 637, 641. These accidents form more than a sufficient basis for the petitioner to be relieved of having to reinstate Lopez in a driving capacity or any other capacity in which he would be responsible for maneuvering, or directing the maneuvers of, any vehicle. Common sense and the safety of airline passengers is sufficient authority for so holding. Indeed, the Board concedes that its order [5] (a bit ambiguous) is not to be construed as requiring that Lopez be reinstated to a driving position.

At the time of his discharge Lopez was acting as an outside field coordinator, whose duties involved overseeing the delivery of meals and equipment for special Eastern Airlines flights. It was in this capacity that he drove a company station wagon to LaGuardia and skidded into a pole.

Immediately after the accident Lopez was told that the company could not keep him on driving and was offered a position as an *inside* coordinator, which would have kept him away from LaGuardia. That he was offered such a position is not beyond debate, but that he declined it is uncontradicted.[6]

Two days later Lopez was "discharged," ostensibly because of his accident record. At the termination interview nothing more was said about the possibility of a job as inside coordinator. Lopez did not mention it or in any way

---

4. The five accidents referred to are as follows: The vehicular accident in which Lopez denies involvement, Record at 638; the three personal injury accidents in the course of his employment that involved only Lopez himself, Record at 636; and the personal automobile accident described in the record, Record at 633.

5. Upon the foregoing findings of fact and conclusions of law * * * it is hereby ordered that Respondent * * * shall:

    *      *      *      *      *

  2. Take the following affirmative action to effectuate the policies of the Act:

  (a) Offer Luis Lopez immediate and full reinstatement *to his former or substantially equivalent position*, without prejudice to his seniority or other rights and privileges enjoyed * * *. Trial Examiner's Decision at 27, 28. (emphasis added).

6. Bank testified as follows:

  I told Mr. Lopez at that point that I couldn't keep him on driving. I offered him possibilities of a switch to work as an inside coordinator, and he told me that he didn't want to work that job, that he was going to plan on leaving work.

  I said, "Look, you're probably still upset. Why don't you go home, take off the next day, and come in Friday morning and I'll talk to you Friday." Record at 644.

  Lopez testified to conversations with Bank at the scene of the accident and also upon return to the Rockaway plant. The substance of what he said was that Bank told him not to worry about the accident and to take the next day off.

indicate that he had changed his mind and would accept an inside job that would keep him away from LaGuardia. The Board faults Marriott for not "pursuing" the possibility. We are not aware that an employer is under any duty to persuade an employee to accept a substitute job offer or to renew firmly a tentative offer that has been clearly declined.

At the termination interview Lopez was told by a management representative that since no other jobs not involving driving responsibility were available, "discharge" was necessary. The examiner and the Board interpret this to mean that, for invidious reasons, the previously available job of inside coordinator was now being withdrawn. It is, of course, possible to read such a meaning into the statement, but only by ignoring the uncontradicted testimony that Lopez had previously rejected possible employment in a non-driving position. Viewing the record as a whole it is more reasonable to discern this: That Lopez was told he could not be continued in any job involving moving vehicular traffic at LaGuardia and that there were no other jobs available other than that of inside coordinator, which he had previously declined. This is not a matter of credibility, but of semantics.

Even if the Board correctly interprets the termination interview to mean withdrawal of the prior tentative offer of an inside job, we find Lopez' silence inexplicable. If he wanted the inside job it is he who should have "pursued" the matter. By failure to protest, or to even inquire, about the previously mentioned job of inside coordinator, while at the same time offering to resume employment as a driver's helper (in which capacity he had participated in two collisions), we think he conveyed his previously expressed disinterest in "inside" employment.

■ Under these circumstances he must be held to have acquiesced in the withdrawal of the inside job offer. In declining to enforce the order of reinstatement we do not substitute our own notion of motivation for the discharge of Lopez for that of the Board. Marriott may have reached the right decision for the wrong reason, but even the Board concedes that Lopez forfeited his right to continue driving vehicles. We hold only that Lopez was offered reinstatement to a non-driving position, declined it, and adhered· to his decision. The conclusion that Lopez was "discharged" is not supported by substantial evidence. Instead it is plain from the record as a whole that he quit rather than give up working at LaGuardia.

Enforcement granted in part and denied in part.