**PRECIOUS METALS ASSOCIATES, INC., et al., Petitioners, Appellants,**

v.

**COMMODITY FUTURES TRADING COMMISSION, Respondent, Appellee.**

No. 79–1449.

United States Court of Appeals, First Circuit.

Argued Jan. 10, 1980.

Decided April 17, 1980.

Lloyd Kadish, with whom Robert A. W. Boraks, Peter Berman, Kadish & Boraks, Washington, D. C., Davis Franklin, and Franklin, Pearlstein & Passalacqua, Boston, Mass., were on brief, for petitioners, appellants.

John P. Connolly, Atty., Commodity Futures Trading Commission, Washington, D. C., with whom John G. Gaine, Gen. Counsel, Pat G. Nicolette, Deputy Gen. Counsel, Gregory C. Glynn, Associate Gen. Counsel, Nancy A. Petranto and Nancy E. Yanofsky, Attys., Commodity Futures Trading Commission, Washington, D. C., were on brief, for respondent, appellee.

Before ALDRICH, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

This case is before us on the petition of Precious Metals Associates, Inc. (PMA) and John W. Carter to review an order of the Commodity Futures Trading Commission (Commission) requiring appellants to cease and desist from the sale of options in violation of the Commodity Exchange Act (Act), as amended in 1976, Pub.L. 95–405, 92 Stat. 867, 7 U.S.C. §§ 1 *et seq.*, and regulations promulgated thereunder. Our jurisdiction over this direct appeal is based upon 7 U.S.C. §§ 9 and 13b.[1]

## PROCEDURAL HISTORY

On November 22, 1978, the Division of Enforcement (Division) of the Commission issued a seven-count complaint alleging that appellants, from June 13 through October, 1978, engaged in the offer and sale of $1.2 million in investment vehicles known as limited risk forward contracts, LRFs, to approximately two hundred clients and that, because LRFs were options, such solicitations and sales violated the agency-imposed ban on the sale of options which went into effect on June 1, 1978.

Arguing that the Commission and the public would be best served by a speedy resolution of the issues of license revocation and imposition of a cease and desist order, the Division urged that Counts I, II, III, and VII, charging the illegal sale of options and futures, be severed and hearings on those counts expedited.[2] The administra-

---

1. A cease and desist order of the Commission is "subject to appeal as in other cases provided for in section 9 . . .." 7 U.S.C. § 13b. In relevant part, § 9 states:

 After the issuance of the order by the Commission, the person against whom it is issued may obtain a review of such order or such other equitable relief as to the court may seem just by filing in the United States court of appeals of the circuit in which the petitioner is doing business a written petition, within fifteen days after the notice of such order is given to the offending person praying that the order of the Commission be set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Commission and thereupon the Commission

 shall file in the court the record theretofore made, as provided in section 2112 of Title 28. Upon the filing of the petition the court shall have jurisdiction to affirm, to set aside, or to modify the order of the Commission, and the findings of the Commission as to the facts, if supported by the weight of evidence, shall in like manner be conclusive.

2. Appellants were charged with violating the following provisions of the Act and regulations.

 Count I: 7 U.S.C. § 6c(c);
 Count II: 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11;
 Count III: 17 C.F.R. § 1.19;
 Count IV: 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.9;

tive law judge to whom the case was assigned approved the severance and scheduled a public hearing for December 4, 1978.[3] Adjudication of the fraud and misrepresentation charges and resolution of the issues of revocation of trading privileges and civil money damages are being held in abeyance pending the outcome of this case.

Upon receipt of the complaint on November 27, 1978, PMA moved, in the United States District Court for the District of Massachusetts, for a temporary order restraining the December 4th public hearing. The district court ordered a ten-day stay of proceedings and granted an additional ten-day extension upon the expiration of the initial order. It declined to issue a preliminary injunction, finding that a waiver of the requirement of exhaustion of administrative remedies was not warranted. The hearing was held on February 21, 1978. The ALJ's findings and recommendations were that: (1) appellants did not violate section 4h (7 U.S.C. § 6h) (illegal futures trading); (2) they did violate sections 4c(b) and 4c(c) (7 U.S.C. § 6c(b) and 6c(c)) (illegal option trading); (3) the facts warranted the imposition of a cease and desist order; and (4) PMA's registration as a futures commission merchant and a commodity trading adviser, and the registration of Carter as an associated person should be suspended for six months pursuant to 7 U.S.C. § 6(b). The Commission adopted the ALJ's findings of fact; issued the cease and desist order; but, with two commissioners dissenting, declined to suspend the registration of PMA and Carter.[4] This appeal ensued.

The issues are: (1) whether the regulatory scheme under which appellants are charged is void for vagueness; (2) whether the doctrines of equitable estoppel and/or laches should be applied; (3) whether the procedures invoked by the Commission comported with fundamental fairness; and (4) whether the sanctions imposed by the Commission are to be sustained.

■ The Commodity Futures Trading Act provides that "the findings of the Commission as to the facts, if supported by the weight of the evidence, shall . . . be conclusive." 7 U.S.C. § 9. Thus, our function on appeal is "to review the record with the purpose of determining whether the finder of fact was justified, i. e., acted reasonably, in concluding that the evidence, including the demeanor of the witnesses, the reasonable inferences drawn therefrom and other pertinent circumstances, supported [its] findings." *Great Western Food Distributors, Inc. v. Brannan*, 201 F.2d 476, 479–80 (7th Cir.), cert. denied, 345 U.S. 997, 73 S.Ct. 1140, 97 L.Ed. 1404 (1953).

## THE FACTS

PMA is a Delaware corporation with its sole office located in Boston, Massachusetts. It is registered with the Commission as a futures commission merchant, commodity trading adviser, and commodity pool operator. Appellant Carter, an associated person within the meaning of 7 U.S.C. § 6k, purchased PMA in June of 1978, after serving as the firm's vice-president of sales and marketing. Carter was a real estate salesperson before entering the commodities field.

PMA engaged in the sale of London commodity options prior to June 1, 1978, the effective date of Commission Rule 32.11 prohibiting traffic in most commodity options. When the ban went into effect, PMA ceased selling options and sought to

Count V: 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.8(a);
Count VI: 7 U.S.C. §§ 6c(b) and 6k and 17 C.F.R. § 32.3(b)(2);
Count VII: 7 U.S.C. § 6h.
Counts IV (fraud allegations), V (misrepresentation) and VI (revocation of registration) were severed. Appellants were found guilty of the illegal sale of options charged in Counts I, II, and III, and not guilty of the illegal sale of futures (Count VII).

**3.** 17 C.F.R. § 10.8 provides: "[u]nless otherwise determined by the Commission, all proceedings within the scope of this Part shall be assigned to an Administrative Law Judge for hearing." The administrative law judge's authority to rule upon motions is derived from 17 C.F.R. § 10.8(8).

**4.** The Commission opinion is reported at 2 Comm.Fut.L.Rep. (CCH) ¶ 20,882.

find an investment vehicle to offer in place of the banned options. It decided that LRF was that vehicle. Carter's efforts to determine whether LRFs came within the option-ban are the basis of appellants' equitable estoppel and laches claims. He consulted with corporate counsel regarding the legality of LRFs under the Commission's interim rules. Counsel "examined the Act, regulations and interpretive opinions of the CFTC and could find nothing defining LRFs or giving any insight into the definitional elements of commodity options or commodity futures." Appellants' Brief at 11. The attorney then called the office of the Commission's general counsel to inquire about the status of LRFs. The staff attorney to whom PMA's lawyer spoke said that she "personally viewed them as options," but declined to render a formal opinion. PMA's attorney advised Carter by letter of the fruits of his research, concluding that LRFs are option-futures "hybrids." At Carter's request, counsel wrote to the Commission seeking an advisory opinion on the status of LRFs. No reply was made to this letter or to subsequent correspondence of another attorney retained by PMA seeking the same thing.

In late June, 1978, Carter instituted, in his words, an "experimental" LRF program. Shortly thereafter, appellants became engaged in the extensive nationwide offer and sale of LRFs for sugar, coffee, copper, and silver.

PMA, prior to Carter's ascendancy, had been plagued by legal problems not relevant to this appeal. During the LRF sales campaign, PMA was embroiled in litigation focusing on prior operating procedures. The Commission attorney handling PMA's other legal problems was aware that PMA was selling LRFs, but did not comment on the program or start proceedings against appellants on LRF grounds at that time.

PMA's sales literature described the LRF as a "hedged contract to buy or sell a specific commodity for a specific price on or before a specific date." The brochure then gave an explanation of the risks involved in an LRF transaction.[5] The literature disseminated by PMA prior to June 1, 1978, utilized the same language to describe the risks inherent in option investments. The later brochures merely substituted "LRF" for "option."

The mechanics of "LRFs" and "options" are almost identical. In exchange for a nonrefundable fee, the purchase price, PMA sold a client the right to buy or sell a specified amount of a particular commodity at a fixed (strike) price on or before the predetermined "declaration date." If the commodity's selling price on the "declaration date" exceeded the purchase price of the LRF (or option) plus the "strike price," there would be a profit.[6] Loss was limited to the amount of the purchase price. After selling an LRF, PMA, through a Geneva, Switzerland, firm, would buy or sell a commodity futures contract on the appropriate London exchange, hedging its futures position with an off-setting commodity option. The terms of the PMA contract on the London exchange paralleled the terms of the PMA-client contract. PMA, not the individual customer, was the owner of record of the London option contract.

While the LRF program was in effect, the Commission and appellants attempted to work out a settlement prior to institution

---

5. "*WHAT ARE MY RISKS?*"

While there are many obvious advantages to dealing in LRF's, there are also definite risks involved. If, during the LRF, the market price stays still or moves against you, you stand to lose the entire cost of your LRF. In addition, if the market does move in your direction, but not enough to cover the cost of your LRF, you will lose part of your original LRF cost. To put it simply, let's go back to sugar. Since each 1-cent move equals $1,100 in equity, if sugar moves only 2 cents in your favor, you will recover $2,200 of your original investment."

6.

| | |
|---|---|
| Purchase Price of LRF | $1,000.00 |
| Strike Price | 2,000.00 |
| Break Even Figure | $3,000.00 |

Profit is made if selling price of commodity exceeds $3,000.00. The record indicates that a minimum one thousand dollar investment was required to open an LRF account.

of enforcement proceedings. When negotiations broke down, the Commission filed its complaint. At that point, PMA discontinued the LRF campaign which in fact had proved to be less than a smashing financial success.

## THE REGULATORY SCHEME

The business of trading contracts for specified amounts of commodities to be sold or bought in the future is an integral component of the American investment scheme. Essentially, two distinct contract forms are involved. A commodity futures contract is an agreement to buy or sell a specified quantum of a specified commodity for a pre-determined price at a specified future date. A commodity option contract, on the other hand, gives a *right* to buy or sell a specified quantum of a specified commodity for a predetermined price (strike price) at a specified future date. A contract entitling its owner to purchase a commodity is referred to within the industry as a "put"; one authorizing a sale is a "call."

From the beginning, the inherent speculativeness of commodity trading and the absence of government regulation spawned a breeding ground for unscrupulous tactics, manipulation, and irresponsible trading. *See* S.Rep.No. 93–1131, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 5843, 5852–55. Early in this century, Congress attempted to curb some commodity trading abuses by enacting the Grain Futures Act of 1922. The Commodity Exchange Act of 1936 broadened the regulatory scheme to include more commodities and empowered the Department of Agriculture to prosecute for fraudulent practices. The 1968 amendments to the Act instituted requirements designed to promote the fiscal responsibility of those selling to the public, and authorized the issuance of cease and desist orders for violations.

By 1973, commodity trading had burgeoned into a $500 billion business. Grave concern with manipulative practices within the industry prompted Congress to enact legislation reflective of current market conditions.[7]

The Commodity Futures Trading Act of 1974, Pub.L. 93–463, 88 Stat. 1389, 7 U.S.C. §§ 1–22 (1975), created the Commodity Futures Trading Commission as an independent regulatory agency, 7 U.S.C. § 4a (1974). The 1974 Act vested the agency with exclusive jurisdiction to regulate commodities and "all other goods and articles, except onions [8] . . . and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 2. While the thrust of the Act is regulation through registration and reporting procedures with power vested in the Commission to deny or revoke licenses, the Act established criminal penalties for noncompliance, fraud, and deceit. 7 U.S.C. § 13.

To enable the Commission to deal effectively with any emergency,[9] Congress au-

---

7. The shift to market-oriented economy has brought the general public into the futures market in growing numbers. Speculators are attracted to the futures markets by the wide price swings and the possibility of large profits. Such an increase in trading by the speculative public, while useful to hedgers, brings with it potential market problems. If individual speculators or groups operating in concert obtain control of the futures markets, price manipulation, corners and squeezes can occur, with adverse effects on producers and consumers alike.

In recent years, the consumer has become increasingly aware that futures markets have a direct effect on such matters as his grocery bill and the cost of his home. Properly operating futures markets help to hold down consumer prices by reducing middleman costs. However, improperly operating futures markets can have the opposite result. In order to assure that futures markets operate properly and that the prices consumers pay are not artificially high, careful and efficient supervision of the markets is essential. [1974] U.S.Code Cong. & Admin. News at 5859.

8. We have been unable to find easily any explanation of why "onions" are exempt. We assume it is because it was already known they make you cry.

9. Emergency was defined as follows:

The term "emergency" as used herein shall mean, in addition to threatened or actual market manipulations and corners, any act of

thorized the Commission "to take such action as, in the Commission's judgment, is necessary to maintain or restore orderly trading in, or liquidation of, any futures contract." Prior to 1974, only option transactions in certain commodities were prohibited. The 1974 Act gave the Commission discretion to extend the ban to newly regulated commodities or to allow their sale in accordance with rules promulgated by the Commission. 7 U.S.C. § 6c(b).

To combat rampant abuses in the sale of options, the Commission adopted registration, disclosure, recordkeeping, and antifraud rules in 1976. 17 C.F.R. § 32.1–.10 (1978). Nevertheless, it was apparent in 1978 that " 'the offer and sale of commodity options in the United States is fraught with fraud and other illegal and unsound practices and represents substantial risks to members of the general public.' " Futures Trading Act of 1978, S.Rep.No. 95–850, 95th Cong., 2d Sess. 14, 24, *reprinted in* [1978] U.S.Code Cong. & Admin.News 2087, 2112. Accordingly, on April 17, 1978, the Commission imposed a temporary ban on the solicitation and sale of most commodity options. 17 C.F.R. § 32.11 (1979).[10] Congress approved Rule 32.11 by incorporating the ban, with some modifications, into the Futures Trading Act of 1978. Section 4c(c) of the Act effectively continued the ban on option selling until such time as the Commission demonstrates "its ability to regulate successfully such transactions." 7 U.S.C. § 6c(c).

## THE VAGUENESS CLAIM

Appellants challenge the constitutionality of the statutes and rules which they were found to have violated as void for vagueness under the fifth amendment. Although the sanctions imposed on appellants are civil in nature, the Commodity Futures Trading Act contains criminal penalties. Should the Department of Justice elect to institute criminal proceedings on those charges which remain to be heard, appellants, if found guilty, would be subject to fines and imprisonment. Because the Act itself treats the offenses of which appellants were found guilty as criminal in nature, and because the unresolved charges arise out of the same operative facts, we must examine the Act and regulations to assure that they are "so framed as to provide a constitutionally adequate warning to those whose activities are governed." *Diebold, Inc. v. Marshall*, 585 F.2d 1327, 1336 (6th Cir. 1978). Fair play requires that notice of proscribed conduct be given the potential offender in advance of the offense. *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954). This principle acknowledges one's freedom to chart a course comporting with the state of the law. "Vague laws may trap the innocent by not providing fair warning." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972). A statute is vague if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application

the United States or a foreign government affecting a commodity or any other major market disturbance which prevents the market from accurately reflecting the forces of supply and demand for such commodity: *Provided,* That nothing herein shall be deemed to limit the meaning or interpretation given by a contract market to the terms "market emergency", "emergency," or equivalent language in its own bylaws, rules, regulations, or resolutions. 7 U.S.C. § 12a(9).

10. Rule 32.11 provides:

§ 32.11 Suspension of commodity option transactions.

(a) Notwithstanding any other provision of this Part 32, it shall be unlawful on and after June 1, 1978, until further rule, regulation or order of the Commission, for any person to solicit or accept orders for, or to accept money, securities or property in connection with, the purchase or sale of any commodity option, or to supervise any person or persons so engaged.

(b) The provisions of paragraph (a) of this section shall not apply to any commodity option offered or entered into in accordance with the provisions of § 32.4(a).

(c) Nothing in this section shall apply to, or affect the rights, privileges or obligations of any person arising out of any commodity option transaction entered into prior to June 1, 1978.

. . . ." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). Definiteness, however, is not an absolute. It does not impose "impossible standards" on the drafter. *United States v. Petrillo*, 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1541–1542, 91 L.Ed. 1877 (1947). Thus, language of proscription is not deficient if it "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Jordan v. DeGeorge*, 341 U.S. 223, 231–32, 71 S.Ct. 703, 95 L.Ed. 886 (1951). Moreover, if the forbidden act involves conduct of a select group of persons having specialized knowledge, and the challenged phraseology is indigenous to the idiom of that class, the standard is lowered and a court may uphold a statute which uses "words or phrases having a technical or other special meaning, well enough known to enable those within its reach to correctly apply them . . . ." *Connally v. General Construction Corp.*, 269 U.S. at 391, 46 S.Ct. at 127. The appropriate measure for testing a statute directed at a class of persons possessed of specialized learning is whether the "language sufficiently conveys a definite warning as to the proscribed conduct, when measured by common understanding and commercial practice." *United States v. Tehan*, 365 F.2d 191, 198 (6th Cir. 1966), *cert. denied*, 385 U.S. 1012, 87 S.Ct. 716, 17 L.Ed.2d 548 (1967) (emphasis added). To determine the certainty of the challenged acts and regulations, we must examine them "in the light of the conduct" with which appellants are charged. *United States v. National Dairy Corp.*, 372 U.S. 29, 33, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963).

The 1974 Act vested exclusive jurisdiction in the Commission over "any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'. . . . ." 7 U.S.C. § 2. The interim regulations adopted by the Commission on November 2, 1976, defined "commodity option transaction" and "commodity option" as "any transaction or agreement in interstate commerce which is or is held out to be of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty' involving any commodity regulated under the Act. . . . ." 17 C.F.R. § 32.1 (1978).

Neither the Act nor the rules promulgated thereunder specifically define "option." The term, however, has certain uniformly accepted characteristics. For example,

> a contractual right to buy, or sell, a commodity or commodity future by some specific date at a specified, fixed price, known as the "striking price."

*British American Commodity Options Corp. v. Bagley*, 552 F.2d 482, 484–85 (2d Cir.), *cert. denied*, 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977);

> [A] London commodity option is the contractual right, but not the obligation, to buy (a "call" option) or sell ("put") a specific commodity futures contract on the appropriate market in London, England, for a certain fixed price (the option's "strike price") within a specified period of time, . . . . .

*Commodity Futures Trading Commission v. British American Commodity Options Corp.*, 2 Comm.Fut.L.Rep. (CCH) ¶ 20,662 at 22–699 (S.D.N.Y.1978);

> "On stock, or other exchanges, a privilege, secured by the payment of a certain premium, or consideration, either (1) of calling for the delivery, or (2) of making delivery, of a certain specified amount of some particular stock or produce, at a specified price, and within specified limits of time. The first kind of option is usually designated a *call*, and the second a *put*; but both are sometimes called *futures.*"

A. Corbin, *Contracts*, § 259, n. 3 (1952), *quoting* Century Dictionary.

■ We might have some concern over the statutory language if it levied sanctions on laypersons. But it does not. The ambit of the statute is limited to members of contract markets, futures commission merchants, and floor brokers. The Act exposes to penalties only highly specialized members

of a professional class who, for purposes of their livelihood, know thoroughly what "options," "privileges," "puts," and "calls" are and how they operate.

The statutory and regulatory language is sufficient to put a broker on notice that attempts to circumvent the statute by a change of the name will not be tolerated.[11] Transactions with the character of "options" are prohibited. Appellants' actions, particularly those of Carter, show that they knew this. Yet their sales literature reflects an attempt to transform PMA's options into LRFs merely by inserting a different designation into the brochures. Such an exercise in semantics will not wash. Under the statute, it is the underlying economic reality of the transaction, not its name, that determines legality.

The United States District Court for the Southern District of New York confronted an analogous situation in *CFTC v. Morgan, Harris & Scott, Ltd.*, 2 Comm.Fut.L.Rep. (CCH) ¶ 20.901 (S.D.N.Y.1979). Defendants attempted to circumvent the June 1, 1978, option ban by offering "deferred delivery" contracts. The court examined the underlying economic reality of the contracts and ruled that they were options in disguise. The court noted that "[t]he requirements of the Act and the Commission's rule cannot be avoided by a defendant who merely gives his illegal activities obfuscatory names." 2 Comm.Fut.L.Rep. ¶ 20,901 at 23,660.

In *CFTC v. Goldex International Limited*, 2 Comm.Fut.L.Rep. (CCH) ¶ 20,839 (N.D.Ill. 1979), 7 U.S.C. § 6c(c) and 17 C.F.R. § 32.11 were found to give warning sufficient to survive a vagueness attack. Defendants argued that "deferred delivery" contracts are not options within the meaning of the statute. The court, declining to accept this rationale, ruled that the term "option" is reasonably well understood in the market place" and found that as applied to the

defendant corporation and employees, it was not vague. 2 Comm.Fut.L.Rep. ¶ 20,-839 at 23,441. Moreover, appellants cannot escape their own brochure definitions. "A Limited Risk Forward, or LRF, is a hedged contract to buy or sell a specific commodity for a specific price on or before a specific date." An option is "a right to buy (or sell) a commodity (sugar, tin, silver, etc.) at a fixed price, for a fixed length of time." The essential distinction between the two definitions is hard to discern. We find that the pertinent statutory sections and regulations easily pass constitutional muster, both facially and as applied.

## EQUITABLE ESTOPPEL

■ The doctrine of equitable estoppel operates to preclude a party, both at law and in equity,

"[f]rom asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

2 *J. Pomeroy, Equity Jurisprudence* § 804 at 1421–22 (3d ed. 1905). The standard for a valid estoppel was articulated by this circuit in *Bergeron v. Mansour*, 152 F.2d 27, 30 (1st Cir. 1945): "A person is estopped from denying the consequences of his conduct where that conduct has been such as to induce another to change his position in good faith or such that a reasonable man would rely upon the representations made."

■ While we recognize that there still is some question as to whether the doctrine of equitable estoppel can apply to the government at all and, if it can, under

---

11. In two recent cases, similar sections of the Act have been subjected to vagueness scrutiny. In *United States v. LaMantia*, 2 Comm.Fut.L. Rep. (CCH) ¶ 20,667 (N.D.Ill.1978), the prohibition against "fictitious" sales contained in 7 U.S.C. § 6c(a)(A) was found to be unconstitu-

tionally vague. The same court ruled that the section's prohibition against "wash sales" was not vague as applied to commodities brokers. *United States v. Siegel*, 472 F.Supp. 440 (N.D. Ill.1979).

what circumstances,[12] we avoid that bramblebush by assuming the application of the doctrine if the facts warrant it. Appellants' claim of equitable estoppel is based on the assertion that any prosecution of them was unfair because they unsuccessfully sought from the Commission a definitive status of LRF vis-a-vis option. The basic fallacy of appellants' position is that there was no misleading conduct or misrepresentations on the part of the Commission. Failure to respond to inquiries does not amount to estoppel conduct. Appellants would have us ascribe to the Commission the interpretation, really wishful thinking, that appellants put on the Commission's silence. While in some instances silence may reasonably induce reliance, this is not such a situation. What appellants did was try to cover the uncertain legality of the LRF operation by inquiring as to its status. Appellants went ahead with an operation knowing full well that it was probably illegal or, at the optimum, that its legality was doubtful. They cannot convert the Commission's silence into approval. They took their chances and must suffer the consequences.

The Sixth Circuit confronted a similar argument in *United States v. Mattucci*, 502 F.2d 883 (6th Cir. 1974). Defendants claimed that government agents' failure to advise them of the illegality of the Barbut game (a gambling game) gave rise to estoppel. Rejecting that argument, the court stated:

> Finally, appellants claim that they were not given fair warning of the illegality of their business, and therefore, the government ought to have been estopped from indicting and prosecuting them. In support of that contention, appellants introduced proof that they had previously sought advice from government agents concerning the legality of the Barbut game. No claim is made that the government agents entrapped defendants, or even that they erroneously advised defendants that their conduct was legal. The claim is that they *failed to advise defendants* of the illegality of the Barbut game under § 1955. The responsibility for determining what conduct shall be illegal under federal law rests with Congress, and Congress bears the burden of doing so with definiteness. *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

*Id.* at 890 (emphasis added).

The regulation banning the sale of options was clear. The 1974 Act did not mandate that the Commission answer requests for interpretation. Moreover, "the Commission's employees are not . . . required to provide advice. . . ." CFTC Interpretative Letter No. 77–17, *reprinted in* 2 Comm.Fut.L.Rep. (CCH) ¶ 20,449 at 22,065.

Appellants engaged in a hedging operation with the Commission as to the legality of the LRF program. They cannot now complain that they hedged on the wrong side of the law. There is no basis for invoking the doctrine of equitable estoppel.

 Intertwined with appellants' equitable estoppel notion is the claim that laches should be invoked because the Commission failed to take instant action upon discovering that PMA had embarked upon an LRF program.

As with equitable estoppel, there is a basic question as to whether laches can be invoked against the government. The Supreme Court has held, "[i]t is well settled that the United States is not . . . subject to the defense of laches in enforcing its rights." *United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940). Nevertheless, courts have not construed this as an absolute bar where unreasonable agency delay has caused hardship. *Equal Emp. Opportunity Com'n v. Liberty Loan Corp.*, 584 F.2d 853, 857–58 (8th Cir. 1978) (four-year delay unreasonable where relevant papers discarded and witnesses moved).

In any event, the facts here do not support estoppel by laches. Appellants commenced their LRF program and sent their

---

**12.** *See* K. Davis, *Administrative Law of the Seventies* § 17.01 at 399 (1976).

first letter to the Commission in June, 1978. In August, a Division attorney requested information on the program. In November, 1978, the Commission, after unsuccessful settlement negotiations, formally charged appellants. The Commission was not obliged to prosecute when knowledge of the program was initially brought to its attention. "[I]t is not true that once a government agency smells a rat, the agency must exterminate it forthwith or allow it the run of the public's house in perpetuo." *United States v. Michael Schiavone & Sons, Inc.*, 430 F.2d 231, 233 (1st Cir. 1970), *appeal dismissed for want of jurisdiction*, 396 U.S. 275, 90 S.Ct. 565, 24 L.Ed.2d 466 (1975). A delay of five months is not inordinate in the context of this case. *See Silverman v. Commodity Futures Trading Com'n*, 549 F.2d 28, 34 (7th Cir. 1977), where a two-year delay in prosecution was found not unreasonable. There is no merit in the laches claim.

## AGENCY PROCEDURE

Appellants attack the bifurcation of the charges against them and the expedition of the proceedings on the counts at issue here.

■■■ We note at the outset that due process mandates that an administrative hearing will constitute "a fair trial, conducted in accordance with fundamental principles of fair play and applicable procedural standards established by law." *Swift & Co. v. United States*, 308 F.2d 849, 851 (7th Cir. 1962). Since "[t]ime is of the essence in futures markets," *In the Matter of Wiscope, S. A.*, 2 Comm.Fut.L.Rep.

(CCH) ¶ 20,757 at 23,108 (1978), *aff'd*, 2 Comm.Fut.L.Rep. (CCH) ¶ 20,785 (1979), the Division of Enforcement moved for bifurcation and expedition so that there could be an immediate determination of whether a cease and desist order should issue. Commission Rule 1.03(b), 17 C.F.R. § 10.3(b), authorizes the Commission to expedite a hearing if it deems that no party will be prejudiced and the ends of justice will be served thereby. If these criteria are met, due process is satisfied. *Silverman v. CFTC*, 562 F.2d 432, 439 (7th Cir. 1977).

The broad grant of authority given the Commission to protect the public interest indicates legislative intent that the Commission employ the appropriate procedures to assure the financial well-being of the investing public. This reflected the Congressional concern over the abuses in option and futures sales.[13]

The Commission responded to the Congressional mandate, in the instant case, by expediting hearings on those issues having an immediate impact on investors. The approach of bifurcation and expedition was justified.

## NOTICE

■■ Appellants claim inadequate notice of the proceeding which was originally scheduled for December 4, 1978. All that is required under the statute is three days notice. 7 U.S.C. § 9. Appellants received formal notification seven days prior to the scheduled date. In addition, the Commission and appellants attempted to negotiate a settlement prior to the institution of for-

---

13. Since 1974, there has been an enormous growth in the number of firms merchandising commodity options to the public. Many of these firms engaged in unscrupulous practices and simply bucketed their customers' orders. Some of these firms were so marginally capitalized that they simply fled when customers sought to exercise their options. This growth of fraud and deception received national attention in the Lloyd, Carr and Co. investigations and prosecutions.

The recent experience with so-called "London options" dramatizes the abuse and consumer fraud resulting from the off-exchange

trading of these instruments. The committee notes that the Commission recently agreed to suspend all commodity options transactions, except certain trade options, effective June 1, 1978. In announcing the suspension, the Commission stated that it "has determined that the offer and sale of commodity options in the United States is at present fraught with fraud and other illegal and unsound practices and represents substantial risks to members of the general public."

Futures Trading Act of 1978, S.Rep.No. 95–850, 95th Cong., 2d Sess. 23–24, *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 2111–12.

mal charges. Only when these negotiations broke down, did the Commission file a complaint against appellants. Thus, there was no element of surprise. Moreover, the hearing was successfully postponed by appellants for three months after they received the requisite notice. Their complaint of inadequate notice is without foundation.

### ENFORCEMENT ACTION

The Commission prosecuted appellants at an enforcement proceeding held pursuant to 7 U.S.C. § 6(b) and 17 C.F.R. § 10.21–26. Appellants contend that the Commission should have employed the rulemaking procedure of 17 C.F.R. § 13.1–6. This argument misapprehends the purpose of rulemaking and overlooks the syllogism inherent in the facts of this case: LRFs are options; option sales were effectively banned on June 1, 1978; therefore, LRFs were banned on June 1, 1978.

■ Rulemaking proceedings are properly employed to resolve disputed questions of law. They are designed to fill in the interstices of a statute. *Securities Com'n v. Chenery Corp.*, 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947), and to "promulgat[e] policy-type rules or standards . . . ." *United States v. Florida East Coast R. Co.*, 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973).

■ Congress vested the Commission with authority to institute an enforcement proceeding.[14] The Commission, believing that appellants were violating provisions of 7 U.S.C., exercised its discretion and chose the enforcement proceeding as the appropriate forum for protecting the public.

In the context of the facts of this case, a rulemaking proceeding would have been inappropriate. The rule, "it shall be unlawful on or after June 1, 1978 . . . for any person to solicit or accept for . . . the purchase or sale of any commodity option . . . ." 17 C.F.R. § 32.11, is not ambiguous. No interstices need to be filled. In addition, a rule promulgated pursuant to 17 C.F.R. § 13.1–6 would have prospective application only. Had the Commission chosen this route, appellants could have sold the options with impunity while awaiting the announcement of a rule that merely reiterated what the law already said. The Commission did not abuse its discretion when it elected to hold an enforcement proceeding.

The Commission ordered appellants to cease and desist from the solicitation and sale of options.[15] They argue that the sanc-

14. 7 U.S.C. § 9 provides for institution of an enforcement action

 If the Commission has reason to believe that any person (other than a contract market) is manipulating or attempting to manipulate or has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any contract market, or has willfully made any false or misleading statement of a material fact in any registration application or any report filed with the Commission under this chapter, or willfully omitted to state in any such application or report any material fact which is required to be stated therein, or otherwise is violating or has violated any of the provisions of this chapter or of the rules, regulations, or orders of the Commission thereunder, . . . .

15. The Commission's authority for imposing the order derives from 7 U.S.C. § 13b, which provides:
 
 § 13b. Manipulations or other violations; cease and desist orders against persons other than contract markets; punishment; misdemeanor or felony; separate offenses

 If any person (other than a contract market) is manipulating or attempting to manipulate or has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any contract market, or otherwise is violating or has violated any of the provisions of this chapter or of the rules, regulations, or orders of the Commission thereunder, the Commission may, upon notice and hearing, and subject to appeal as in other cases provided for in section 9 of this title, make and enter an order directing that such person shall cease and desist therefrom and, if such person thereafter and after the lapse of the period allowed for appeal of such order or after the affirmance of such order, shall fail or refuse to obey or comply with such order, such person shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $100,000, or imprisoned for not less than six months nor more than one year, or both, except that if such failure or refusal to obey

tion imposed is too harsh. In *Butz v. Glover Livestock Com'n Co.*, 411 U.S. 182, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973), the Supreme Court delineated the appropriate standard for review of administrative sanctions.

The applicable standard of judicial review in such cases required review of the Secretary's order according to the "fundamental principle . . . that where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy 'the relation of remedy to policy is peculiarly a matter for administrative competence.'" *American Power Co. v. SEC*, 329 U.S. 90, 112, 67 S.Ct. 133, 91 L.Ed. 103 (1946). Thus, the Secretary's choice of sanction was not to be overturned unless the Court of Appeals might find it "unwarranted in law or . . . without justification in fact . . . ." *Id.* at 112–113, 67 S.Ct. at 146; *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941); *Moog Industries, Inc. v. FTC*, 355 U.S. 411, 413–414, 78 S.Ct. 377, 379–380, 2 L.Ed.2d 370 (1958); *FTC v. Universal-Rundle Corp.*, 387 U.S. 244, 250, 87 S.Ct. 1622, 1626, 18 L.Ed.2d 749 (1967); 4 K. Davis, Administrative Law § 30.10, pp. 250–251 (1958).

*Id.* at 185–86.

The sanction here is neither "unwarranted in law [n]or without justification in fact." Appellants argue that the order was not justified because they voluntarily discontinued their LRF program. A cease and desist order is justified when the party who commits statutory transgressions is likely to persist in the contumacy in the future, unless restrained. A solitary infraction may be insufficient to support a cease and desist order, *see NLRB v. Beth Israel Hospital*, 554 F.2d 477, 483 (1st Cir. 1977), but a proclivity to violate the law can be proved "when a record discloses persistent attempts to interfere with legislatively protected rights . . . ." *NLRB v. Union Nacional de Trabajadores*, 540 F.2d 1, 11 (1st Cir. 1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977).

The regulatory ban effective June 1, 1978, did not deter appellants from continuing their option program under another name, even though they had doubts as to its legality. Appellants' plea for mitigation has a hollow ring. One of the factors in ending the program was that it was not profitable. But the profitability picture could change. Having no assurance that, without imposition of a cease and desist order with its attendant penalties for violation, appellants would not adopt the same game plan for an option under yet another name, the Commission was justified in imposing a cease and desist order.

*Affirmed.*

---

or comply with such order involves any offense within paragraph (a) or (b) of section 13 of this title, such person shall be guilty of a felony and, upon conviction thereof, shall be subject to the penalties of said paragraph (a) or (b): *Provided,* That any such cease and desist order against any respondent in any case of manipulation of, or attempt to manipulate, the price of any commodity shall be issued only in conjunction with an order issued against such respondent under section 9 of this title. Each day during which such failure or refusal to obey or comply with such order continues shall be deemed a separate offense.