618 F.2d 1329
 1980-81 Trade Cases 63,684
 DE JONG PACKING COMPANY, and Mt. Vernon Meat Co., Inc., Petitioners,
v.
The UNITED STATES DEPARTMENT OF AGRICULTURE, Respondent.
HYGRADE FOOD PRODUCTS CORPORATION, Petitioner,
v.
The UNITED STATES, the Secretary of Agriculture and the
Packers and Stockyards Administration, Respondents.
 Nos. 77-2722, 77-2979.
 United States Court of Appeals,
Ninth Circuit.
 April 7, 1980.
Rehearing Denied June 3, 1980.
 
 James F. Henriot, Tacoma, Wash., for Hygrade Food Products Corp.
 Ronald R. Glancz, Washington, D. C., on brief; James M. Kelly, Dept. of Agriculture, Washington, D. C., for U. S. Dept. of Agriculture.
 Peter Jay Visser, Le Cocq, Simonarson & Visser, Lynden, Wash., for De Jong Packing Co.
 On Petition to Review a Decision of the Secretary of Agriculture.
 Before MERRILL and SNEED, Circuit Judges, and ZIRPOLI,* District Judge.
 MERRILL, Circuit Judge:
 
 FACTS
 
 1
 The Packers and Stockyards Administrator instituted this administrative action under the Packers and Stockyards Act ("the Act"), 7 U.S.C. § 181 et seq., alleging violations of § 202(a), (e) and (g) of the Act.[1] The complaint alleged that a group of packers, petitioners here, had conspired to force auction stockyards to change their terms of sale, from "as is" sales of slaughter cattle, under which the packers bear the risk that the cattle will fail to pass government inspection, to "subject" sales those subject to the cattle's passing government inspection which place the risk of loss on the seller.
 
 
 2
 The administrative law judge found that petitioners had violated the Act as charged and that petitioner De Jong had violated 9 C.F.R. § 201.43(b) as well, and that appropriate cease and desist orders should issue. The government, contending that the cease and desist order was insufficiently broad, appealed to the Judicial Officer, who has final authority to decide cases within the Department of Agriculture. Petitioners also appealed, contending that the cease and desist orders should not have issued. The Judicial Officer sustained all findings of violations. In addition, he concluded that all petitioners, not just De Jong, had violated 9 C.F.R. § 201.43, because they had conspired with De Jong. Accordingly, he broadened the scope of the cease and desist order.[2] Petitioners have appealed to this court.
 
 
 3
 Under the customary trade practices and marketing procedures of the northwest Washington livestock auction markets, the purchase of livestock is on an "as is" basis unless otherwise expressly specified prior to sale. When so purchased, the purchaser buys the animals as he sees them with no guarantee that they are suitable for any purpose. He assumes the risk of subsequently discovered defects, and full payment is due within one business day of purchase.
 
 
 4
 When slaughter cattle are sold at an auction market on a "subject" basis, the sale is contingent upon the animal passing federal inspection as fit for human consumption, and payment is not due until one business day after the animal has passed inspection.
 
 
 5
 It is not practicable or lawful to sell a particular animal at auction with some prospective buyers bidding on an "as is" basis, while others bid on "subject" terms. It is the responsibility of the stockyard owner to fix the terms of sale.[3] Under the practice at northwest Washington auctions, cattle are very rarely sold on "subject" terms; only cattle with visible defects or which have elicited no "as is" bid are so sold.
 
 
 6
 In early February, 1972, petitioners, with the exception of Hygrade, signed a letter to the stockyards which stated that in the future petitioners would purchase and pay for cattle only subject to their passing government inspection.[4] The stockyards promptly rejected the proposed change in policy. On March 8 and 9, 1972, the Packers and Stockyards Administration sent letters to the packers advising them that it considered their actions to be in violation of the Act, and that it would take further administrative action if the stockyards did not "reconsider." All packers but petitioner De Jong appear to have reconsidered. Their purchase of cattle continued on an "as is" basis and they promptly paid for all cattle purchased, in accordance with the practice. De Jong, however, refused to pay for any cattle sold to it which were subsequently condemned. The Washington State Department of Agriculture then initiated proceedings pursuant to the state's regulatory program, seeking to compel De Jong to pay. A state court found that De Jong had bought the cattle on "subject" terms and therefore, as a matter of contract law, was not required to pay.
 
 
 7
 Shortly after that decision became final, during April of 1974, each petitioner (now including Hygrade) sent a letter to the stockyards informing them that as of May 1, 1974 (in one case as of April 29, 1974), all bids would be subject to the cattle passing inspection, and that payment for cattle would be delayed for three bank days pending determination as to whether the cattle were fit for human consumption. (Hygrade's letter varied only in specifying that it would implement this policy by withholding the average price of two animals for the three-day period.)
 
 
 8
 From May 1, 1974, to May 15, 1974, petitioners adhered to their announced position and no cattle were purchased "as is." During the last two weeks of May, 1974, however, all petitioners notified the stockyards that they were rescinding their "subject" policy and resumed bidding for cattle on an "as is" basis.
 
 EVIDENCE OF CONSPIRACY
 
 9
 It is clear that bidding for cattle on a "subject" basis is perfectly legal, and that any packer acting independently is free to bid on such terms. If what was done here constituted a violation of § 202, it was because concerted action was taken by petitioners. The existence of a conspiracy or agreement thus becomes critical. Petitioners contend that the record does not support the Judicial Officer's finding of conspiracy. Our question on review is whether the finding is supported by substantial evidence. Corona Livestock Auction, Inc. v. United States Department of Agriculture, 607 F.2d 811 (9th Cir. 1979).
 
 
 10
 It is clear that a conspiracy existed as of February 8, 1972, when petitioners (absent Hygrade) joined in advising the stockyards that all future bids would be "subject" bids. As the Judicial Officer noted in his decision:
 
 
 11
 "This case is quite unusual! 'Conspirators seldom sign articles of partnership in crime which may thereafter be conveniently put into evidence by the prosecution.' United States v. Morris, 225 F.2d 91, 95 (C.A.7), certiorari denied, 350 U.S. 901 (76 S.Ct. 179, 100 L.Ed. 792)."
 
 
 12
 The question, then, is whether a conspiracy existed in 1974, when petitioners individually notified the stockyards that their bids would be confined to "subject" bids in the future. Petitioners assert that they all simultaneously and independently arrived at the decision to send their 1974 letters as a result of De Jong's success in Washington state courts. This contention was rejected by the Judicial Officer. He noted that the state court success was founded on the state court finding that the livestock markets had accepted De Jong's bids knowing that they were "subject" bids. Thus, the co-operation of the livestock markets in continuing to accept "subject" bids was necessary to future success. The Judicial Officer stated:
 
 
 13
 " * * * the State Court decision was not likely to make each of the respondents, acting independently, come to the conclusion that he alone could force the auction markets to change their sales policy effective May 1, 1974 (or April 29, 1974)."
 
 
 14
 As to whether a 1974 conspiracy existed, the Judicial Officer stated:
 
 
 15
 "There is no evidence in this case that any of the conspirators withdrew from the conspiracy prior to mid-May 1974. Merely purchasing livestock in 1972 and 1973 without enforcing the terms of the February 1972 ultimatum is no evidence that the conspirators abandoned their conspiratorial purpose. In fact, I infer from their unity of action in 1974, following the State Court decision, that in 1972 and 1973, the respondents other than Hygrade were merely biding their time awaiting the outcome of De Jong's activities in furtherance of the conspiracy."
 
 
 16
 We find this inference to be rational. Further, the parallel action taken in 1974 lends support to the inference that it was in response to a conspiracy. The similarity of the letters written by the individual petitioners, the manner in which terms and conditions of purchase were stated by each, and the coincidence of the effective dates selected by each (April 29, and May 1, 1974), all lend credence to the view that each petitioner was aware of the action taken by the others and was acting in concert with the other petitioners. It is conceded that there was "trade talk," of which petitioners were aware, regarding a boycott. While mere consciously parallel action is not sufficient to demonstrate conspiracy, neither is express agreement required; it is "enough that knowing that concerted action was contemplated or invited, (defendants) gave their adherence to the scheme and participated in it." Interstate Circuit Co. v. United States, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939). Accord, Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3d Cir. 1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 84-85 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); Esco Corp. v. United States, 340 F.2d 1000, 1008 (9th Cir. 1965).
 
 
 17
 Here, from the facts that petitioners combined to seek "subject" terms in 1972 and waited to act together again in 1974, it can be inferred that petitioners believed that concerted action was necessary to achieve their purpose, and that no petitioner would have acted as it did had it not believed that the others would do the same.
 
 
 18
 We conclude that as to all petitioners who joined in the 1972 notice to stockyards there is substantial evidence to support the finding that the 1972 conspiracy was not abandoned prior to 1974, and that the writing of the 1974 letters constituted concerted action taken pursuant to agreement.
 
 
 19
 As to Hygrade the company that did not join in the 1972 letter the Judicial Officer found that it "knowingly and intentionally joined the conspiracy in 1974." He based his finding on the similarity between the conditions set forth in the Hygrade letter and those set forth in the letters of the other petitioners,[5] and on the coincidence in timing.[6]
 
 
 20
 We conclude that there was substantial evidence to support the finding that Hygrade, in 1974, joined the ongoing conspiracy formed by the other petitioners in 1972.
 
 UNFAIR PRACTICE UNDER SECTION 202(A)
 
 21
 The administrator alleged violations of subsections (a), (e) and (g) of § 202 (see footnote 1).
 
 
 22
 As to subsection (g), petitioners assert that they have never conspired to do any act made unlawful by the section; that if they conspired at all, it was to do a perfectly lawful act to bid only on "subject" terms. We agree and find no violation of subsection (g).
 
 
 23
 At to subsection (e), the alleged violation is apparently based on the contention that the conspiracy, in effect, was to fix prices, the rationale apparently being that since the petitioners would only bid "subject," they were fixing prices of condemned cattle at zero. We cannot accept the notion that a conditional sale is an effort to fix prices. If the condition is not met, then no purchase takes place at all. The unfit cattle are not purchased at zero dollars; they are simply not purchased. Accordingly, we find no violation of subsection (e).
 
 
 24
 The problem is with subsection (a), and the question is whether this conspiracy constitutes an unfair practice under that subsection. The fact that the conspiracy is not a subsection (g) violation, and that absent concert of action "subject" bidding is not an unfair practice, does not provide an escape. A competitor "can do many things independently which he may not combine with others to accomplish." Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., supra, 416 F.2d at 76. See United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).[7] What is charged as unfair is the attempt to coerce a change in marketing practices by concerted action; to obtain by concert of action market power not possessed by the purchasers individually and, by exercise of that market power, to obtain a favorable change in marketing practices that could not have resulted from the free play of competitive forces.
 
 
 25
 Such conduct falls squarely within the prohibition of Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930), and United States v. First National Pictures, Inc., 282 U.S. 44, 51 S.Ct. 45, 75 L.Ed. 151 (1930).[8] In Paramount Famous Lasky Corp., a group of motion picture distributors agreed that they would deal with exhibitors only on the terms of a standard exhibition contract which required arbitration of all disputes. The Court held that the "manifest purpose" of this arrangement was "to coerce the exhibitor and limit the freedom of trade," and that the "necessary and inevitable" effect of such an agreement was the unreasonable restraint of competition. 282 U.S. at 41-42, 51 S.Ct. at 44. The Court conceded that arbitration might be well suited to the needs of the film industry, but concluded that the statute could not
 
 
 26
 " ' * * * be evaded by good motives. The law is its own measure of right and wrong, of what it permits, or forbids, and the judgment of the courts cannot be set up against it in a supposed accommodation of its policy with the good intention of the parties, and, it may be, of some good results.' Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 49 (, 33 S.Ct. 9, 15, 57 L.Ed. 107)."
 
 
 27
 282 U.S. at 43-44, 51 S.Ct. at 45. This is precisely what petitioners would have us do.
 
 
 28
 First National Pictures, Inc., involved the same parties; there, the distributors agreed to deal only with exhibitors who agreed to provide a security deposit as required by the standard contract and to assume any contractual obligations of the prior theater owner. The Court found that its decision in Paramount Famous Lasky Corp. was dispositive; it concluded that
 
 
 29
 "The obvious purpose of the arrangement is to restrict the liberty of those who have representatives on the film boards and secure their concerted action for the purpose of coercing certain purchasers of theaters by excluding them from the opportunity to deal in a free and untrammeled market."
 
 
 30
 282 U.S. at 54, 51 S.Ct. at 48.
 
 
 31
 The situation in the present case is indistinguishable. Here, as in Paramount Famous Lasky Corp. and First National Pictures, Inc., a group of competitors have joined together for the purpose of coercing more favorable terms of trade from third parties than they could obtain through the normal play of competitive forces.
 
 
 32
 In Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., supra, we drew a distinction between "normal and usual" agreements by which parties restrict their liberty to deal with others, which are permissible, and those with the "purpose to coerce the trade policy of third parties or to secure their removal from competition," which are not. 416 F.2d at 77 (citations omitted). Here, it was the clear and sole purpose of petitioners to exert a coercive influence upon the trade practices of third parties in order to exact more favorable terms than they could otherwise obtain. This the Judicial Officer could properly enjoin.
 
 
 33
 Petitioners contend that their two unsuccessful attempts to coerce a change in marketing practices have demonstrated lack of market power on their part; that Paramount Famous Lasky Corp. and First National Pictures, Inc., are to be distinguished in that market power was clearly present in those cases; that without market power no adverse effect on competition is to be expected, and that for this reason a cease and desist order should not have been entered here.
 
 
 34
 Initially, we note that there may have been reasons for the failure of petitioners' coercive efforts other than lack of market power. However, even assuming that petitioners lacked market power, and even were we to conclude that petitioners' lack of market power would preclude our finding that they had violated the Sherman Act, the cease and desist order under § 202 was proper.
 
 
 35
 The consequences of violation of the Sherman and Clayton Acts are far more substantial than here, where the issue is simply whether the practice in question should be halted.
 
 
 36
 The question would seem to be whether, under the Act, a practice cannot be halted as unfair under § 202 unless competitive harm has already occurred, or whether the likelihood that harm will result suffices. This question we did not reach in Corona Livestock Auction, Inc. v. United States Department of Agriculture, supra, 607 F.2d 811 (9th Cir. 1979), or Central Coast Meats, Inc. v. United States Department of Agriculture, 541 F.2d 1325 (9th Cir. 1976).
 
 
 37
 The government contends that the purpose of the Act is to halt unfair trade practices in their incipiency, before harm has been suffered; that unfair practices under § 202 are not confined to those where competitive injury has already resulted, but includes those where there is a reasonable likelihood that the purpose will be achieved and that the result will be an undue restraint of competition. We agree. See Swift & Co. v. United States, 393 F.2d 247, 253 (7th Cir. 1968); Wilson & Co. v. Benson, 286 F.2d 891, 895 (7th Cir. 1961). Cf. FTC v. Brown Shoe Co., 384 U.S. 316, 322, 86 S.Ct. 1501, 1504, 16 L.Ed.2d 587 (1966); FTC v. Motion Picture Adv. Co., 344 U.S. 392, 394-95, 73 S.Ct. 361, 363-64, 97 L.Ed. 426 (1952). It would make little sense and might prove disruptive of the market to hold that petitioners may continue to repeat their concerted efforts to coerce a change in market practices and may be halted only when they have finally acquired sufficient market power to succeed.
 
 
 38
 We affirm the Judicial Officer's conclusion that petitioners engaged in an unfair trade practice in violation of § 202(a) of the Act, 7 U.S.C. § 192(a).
 
 REGULATION 201.43(B)
 
 39
 Petitioners contend that the Judicial Officer erred in ruling that De Jong had violated Regulation 201.43(b) by failing to pay for condemned cattle within one business day following sale, and that the other petitioners, as De Jong's coconspirators, had likewise violated the regulation. They contend that the Washington state court proceedings had established that the sale in question was a "subject" sale, and that when it had been determined that the livestock were unfit no obligation to pay arose. However, that decision was based on the state's regulatory program rather than the federal program and the federal government was not party to the state court proceedings; it in no sense had a "laboring oar" in those proceedings. See Montana v. United States, 440 U.S. 147, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979). Thus, neither claim nor issue preclusion resulted. Cf. Commissioner v. Estate of Bosch, 387 U.S. 456, 457, 87 S.Ct. 1776, 1778, 18 L.Ed.2d 886 (1967). We have already ruled that substantial evidence supports the Judicial Officer's findings of conspiracy.
 
 
 40
 As to whether the sales in question were "as is" or "subject" the administrative law judge and the Judicial Officer found them to be "as is"; they found that all markets involved had rejected the 1972 letter and had followed their regular practice of selling "as is." The Judicial Officer concluded that since, under the Act, it is the market operator who has the responsibility for fixing the terms of sale and market practices (see footnote 3), a purchaser cannot unilaterally impose his conditions of sale without consent or approval of the market operator. He stated:
 
 
 41
 "If the State Court's decision were sound, it would destroy the public livestock marketing system. Under the State Court's decision, each buyer could establish the terms and conditions relating to his purchase of animals at an auction stockyard merely by advising the market of such terms and conditions, notwithstanding the market's refusal to accept such terms. * * *
 
 
 42
 Accordingly, when a stockyard owner-market operator establishes that cattle are sold 'as is' at his market, any packer who bids on cattle at that market is buying the cattle 'as is'; * * *."
 
 
 43
 We find substantial evidence to support the Judicial Officer's findings and agree with his conclusions.
 
 OTHER CONTENTIONS
 
 44
 We find no merit in petitioners' contention that their withdrawal of their 1974 letters rendered the dispute moot. As the Supreme Court stated in United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1952), a case involving regulation by the Federal Trade Commission:
 
 
 45
 "(V)oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case . . . A controversy may remain to be settled in such circumstances, . . . e. g., a dispute over the legality of the challenged practices . . . The defendant is free to return to his old ways. . . . The case may nevertheless be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.' The burden is a heavy one." (Emphasis added.)
 
 
 46
 Accord, Oregon-Washington Plywood Co. v. FTC, 194 F.2d 48, 51 (9th Cir. 1952). There is substantial evidence to support the conclusion that petitioners did not meet this heavy burden.
 
 
 47
 We find no merit in Hygrade's contention that as to it the cease and desist order, being nation-wide in scope, was unnecessarily broad. As the Judicial Officer noted in his decision, it is common practice under the Act to make cease and desist orders nation-wide in scope. This practice was upheld in Wilson & Co. v. Benson, supra, 286 F.2d at 896. In our view, if a packer has engaged in an unfair practice which should be halted, it is not unreasonable to make the order as broad as the packer's operations.
 
 
 48
 The order is affirmed.
 
 
 49
 SNEED, Circuit Judge, concurring in part and dissenting in part:
 
 
 50
 I concur in the court's opinion with the exception of that portion that finds a violation of section 202(a) of the Act, 7 U.S.C. § 192(a) (1964). As to this portion I would remand to the Administrator to determine the pro- and anti-competitive effects of the packers' conduct the majority finds to amount to an "unfair, unjustly discriminatory, or deceptive practice or device in commerce."
 
 
 51
 Courts in dealing with matters requiring application of the antitrust laws frequently resort to per se rules or their functional equivalent as has the majority in this case. One can speculate on the reasons for this tendency. Whatever the full array of reasons might be, one which surely is among the foremost is the desire to simplify the administration of the antitrust laws by the courts. The difficulty with zealous pursuit of this end is that often it results in judicial indifference to the actual economic effect of the practice branded with the per se iron.
 
 
 52
 I believe the majority's section 202(a) holding reflects this indifference. Concerted activity alone is not a per se violation of the antitrust law. Whether it is or not depends on its purpose and effect. Joseph E. Seagram & Sons Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969), established this principle for this circuit. The proscribed purposes were there described as "either to exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both." Id. at 76. On this record I can not say that the concerted activity of the packers, which the majority found to contravene section 202(a), served any such purpose. It is possible that "subject" terms would enhance competition with respect to the quality of animals offered for sale and reduce the costs of meat to consumers. It is also possible that they would be no more and no less anti-competitive than are "as is" terms. All we know for certain is that the farmers, stockyard owners, and the Department of Agriculture favor "as is" sales. The solidity of this front does not guarantee that its position is more competitive, or even less anti-competitive, than that favored by the packers.
 
 
 53
 The approach I suggest is not contrary to the authorities. This dissent shall not be lengthened by a critical analysis of the numerous relevant cases. In the margin are set out some authorities and sources that give support to the approach I believe should have been taken in this case as well as a brief analysis of Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145 (1930), and United States v. First National Pictures, Inc., 282 U.S. 44, 51 S.Ct. 45, 75 L.Ed. 151 (1930), that suggests these venerable oaks in the antitrust forest do not stand in the way of the direction I think we should have gone.[1]
 
 
 
 *
 Honorable Alfonso J. Zirpoli, Senior United States District Judge of the Northern District of California, sitting by designation
 
 
 [1]
 Section 202 of the Act, 7 U.S.C. § 192 (1964) (amended 1976), provides in pertinent part:
 "It shall be unlawful with respect to livestock, meats, meat food products, livestock products in unmanufactured form * * * for any packer * * * to:
 (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce; or
 (e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices in commerce, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article in commerce, or of restraining commerce; or
 (g) Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a)-(d) or (e) of this section."
 The administrator also alleged violation of § 201.43(b) of the Regulations, 9 C.F.R. § 201.43(b) (1977) (amended 1977), which provides in pertinent part:
 "Purchasers to pay promptly for livestock. Each packer, market agency, or dealer purchasing livestock shall, before the close of the next business day following the purchase of livestock and the determination of the amount of the purchase price, transmit or deliver to the seller or his duly authorized agent the full amount of the purchase price, unless otherwise expressly agreed between the parties before the purchase of the livestock. * * *"
 Violation was also charged of two other regulations prohibiting the furnishing of information to competitive buyers, and the restriction or limitation of competition. On appeal, these have been treated as encompassed within the statutory violation.
 
 
 [2]
 The Judicial Officer's order provides:
 "Respondents DeJong Packing Company, Ferry Bros., Inc., Hygrade Food Products Corporation, Mount Vernon Meat Co., Inc., and John F. Lenz, their officers, directors, agents, employees, successors, and assigns, directly or indirectly, individually or in combination with others, or through any corporate or other device, in connection with their operations as packers, shall cease and desist from:
 
 
 [1]
 Entering into or acting in furtherance of any conspiracy, combination, agreement or arrangement with any other packer or livestock buyer for the purpose or with the effect of establishing or imposing any terms or conditions relating to the purchase of or the payment for livestock purchased in commerce
 
 
 [2]
 Conducting any of its operations relating to the purchase of livestock in commerce jointly or in combination with any other packer or livestock buyer, or furnishing any information of such buying operations to any other packer or livestock buyer
 
 
 [3]
 Failing to pay, when due, the full purchase price of livestock purchased in commerce
 This order shall become effective as to each respondent on the first day after service upon such respondent."
 
 
 [3]
 7 U.S.C. § 208(b) (Supp.1979) provides in part:
 "It shall be the responsibility and right of every stockyard owner to manage and regulate his stockyard in a just, reasonable, and nondiscriminatory manner, to prescribe rules and regulations and to require those persons engaging in or attempting to engage in the purchase, sale, or solicitation of livestock at such stockyard to conduct their operations in a manner which will foster, preserve, or insure an efficient, competitive public market."
 
 
 [4]
 As to this letter, the administrative law judge stated in his initial decision:
 "The obvious tenor of the document is threatening and coercive. * * * The meaning of the document was not unclear to the recipient markets. They understood it to be what it was an ultimatum by their major customers. Without the patronage of these customers, the markets could not profitably conduct their business. Upon receipt of this ultimatum, it is no wonder that the markets sought Government aid in order to resist."
 Petitioners allege that they took this action in response to the increasingly common practice on the part of some sellers of administering antibiotics so that diseased cattle which will not pass government inspection appear to be healthy at the time of auction. The market operators opposed the shift to "subject" terms, asserting that it would cause added administrative problems and expense to the market. The Judicial Officer found that "each group had valid business reasons for its position * * *."
 
 
 [5]
 The Judicial Officer stated:
 "1. Both letters applied only to cattle (although Hygrade purchases other species).
 
 
 [2]
 Under both letters, all cattle would be purchased 'subject' rather than 'as is.'
 
 
 [3]
 Both letters provided that the packer would refuse to pay for an animal found unfit for human consumption if slaughtered within the identical time period, viz., three bank days; and both provided for the packer to pay for condemned animals slaughtered after such period
 
 
 [4]
 Both letters provided for notice of condemnation by telephone, with condemnation slips to be thereafter mailed to the auction markets
 The only difference between the purchasing conditions of the two letters was in the method of payment. Hygrade would have withheld payment of only two animals from each sale until it was determined whether any animals failed to pass inspection; * * * whereas the other respondents would have withheld payment for all cattle for three bank business days."
 
 
 [6]
 The Judicial Officer stated:
 "3. Hygrade's letter was sent practically simultaneously with the letters of the other respondents in 1974, and all of the letters had the identical effective date, May 1, 1974, except for Ferry, which had an April 29, 1974, effective date. Respondents contend that they all simultaneously and independently arrived at the decision to send their 1974 letters as a result of the State Court decision referred to in Findings 11, 12 and 19, supra. But it is not likely that such uniformity in timing would have occurred absent collective action. The State Court decision was filed February 15, 1974. The time for appeal expired about March 18, 1974. Although the beginning of a month might have been picked by each respondent, acting independently, as the effective date for action, not one of the respondents picked April 1, 1974, as the effective date, and not one picked June 1, 1974, or thereafter as the effective date."
 
 
 [7]
 While § 202 of the Packers and Stockyards Act may have been made broader than antecedent antitrust legislation in order to achieve its remedial purpose, it nonetheless incorporates the basic antitrust blueprint of the Sherman Act and other pre-existing antitrust legislation such as the Clayton Act and the Fair Trade Commission Act. See Armour & Co. v. United States, 402 F.2d 712, 722 (7th Cir. 1968); Swift & Co. v. United States, 393 F.2d 247, 253 (7th Cir. 1968). Thus the courts that have considered § 202 have consistently looked to decisions under the Sherman Act for guidance, although recognizing that § 202 in some cases proscribes practices which the Sherman Act would permit. E. g., Armour & Co. v. United States, supra, 402 F.2d 712 (7th Cir. 1968); Swift & Co. v. United States, supra, 393 F.2d 247 (7th Cir. 1968); Swift & Co. v. United States, 308 F.2d 849, 853 (7th Cir. 1962). The parties in the present case agree, as indeed they must, that decisions under the Sherman Act are germane to the issues before us
 
 
 [8]
 The Supreme Court did not indicate in Paramount Famous Lasky Corp. or First National Pictures, Inc., whether it was proceeding under the rule of reason or whether it deemed the practices in question illegal per se. The court used language which suggests a rule-of-reason analysis and it also used language which suggests a per-se approach
 We do not find it necessary to decide that question here or to suggest which mode of analysis should apply under the Sherman Act. The present Act, as we discuss later is, if anything, broader in scope than the Sherman Act, and conduct of the kind held improper in Paramount and First National would clearly justify issuance of a cease and desist order under § 202.
 
 
 [1]
 A tidy constellation of Supreme Court decisions stands for the proposition that group boycotts are per se illegal. United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); see also L. Sullivan, Antitrust 229-30 (1977); R. Posner, Antitrust Law: An Economic Perspective 207 (1976); von Kalinowski, 11 Antitrust Laws and Trade Regulation P 76.01, at 76-1 to 76-2 (1969); Barber, Refusals to Deal Under the Federal Antitrust Laws, 103 U.Pa.L.Rev. 847 (1955); Comment, Per Se Illegality and Concerted Refusals to Deal, 13 B.C.Ind. & Com.L.Rev. 484 (1972). If every group refusal to deal were a boycott, then all attempts to pool bargaining power would fall under the per se prohibition, for a group bargaining posture necessarily depends on overt or implicit threats of group refusal to deal. In a number of decisions, however, the Court has indicated that the concept of unlawful boycott does not extend so far. Fashion Originators' Guild of America, Inc. v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); Appalachian Coals, Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825 (1933); Chicago Bd. of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). Further retreat from peremptory condemnation of the concerted refusal to deal seems inevitable given the unexplored range of differently motivated practices that would otherwise be outlawed. For a discussion of some joint activities yet to be examined by the courts, see L. Sullivan, supra, at 247-311
 Paramount Famous Lasky Corp. v. United States, supra, and United States v. First Nat'l Pictures, Inc., supra, both decided under the Sherman Act, convinced the majority that it is an antitrust violation for competitors jointly to exact more favorable terms of trade from their suppliers than they could otherwise obtain "through the normal play of competitive forces." 618 F.2d at 1336. The majority applies the principle just stated to the packers' conduct. This of course assumes that the conduct deviated from the competitive norm, but more importantly, it puts forward a reading of Paramount Famous Lasky and First National Pictures, and an assessment of their place in antitrust jurisprudence, that are highly questionable.
 Neither Paramount Famous Lasky nor First National Pictures uses the term "boycott" or explicitly applies a per se rule. Indeed, Mr. Justice McReynolds' opinions for the Court in these cases are hardly specific in their criticism of the condemned joint activities. Judge Friendly has recently described the "somewhat inscrutable opinion" in Paramount Famous Lasky as leaping to a result "(a)fter quoting from a miscellany of largely irrelevant opinions about the purposes of the Sherman Act." Drayer v. Krasner, 572 F.2d 348, 354 (2d Cir. 1978). Film distributors in Paramount Famous Lasky agreed to use a standard contract form in dealing with exhibitors and not to deal with any exhibitor who breached the form's arbitration clause. The clause was the focus of the parties' and the Court's attention. The opinion does not emphasize the combination by the distributors at all. It stresses instead that the contract "cannot be classed among 'those normal and usual agreements in aid of trade and commerce' " which, though restraints of trade, are deemed reasonable and permissible. 282 U.S. at 43, 51 S.Ct. at 45; cf. Drayer v. Krasner, supra, 572 F.2d at 355 (suggesting that the Court's generally low opinion of arbitration at the time may account for the result). Nevertheless, Mr. Justice McReynolds went on to shift the blame from arbitration as such to its anti-competitive effect in this setting. "It may be that arbitration is well adapted to the needs of the motion picture industry; but when under the guise of arbitration parties enter into unusual arrangements which unreasonably suppress normal competition their action becomes illegal." Id. Although this hints that the Court saw a weakening of competition not in the mere pooling of the distributors' bargaining power but in the design of this particular arbitration clause, the opinion goes no further. Judge Friendly offers the following hypothesis:
 The details of the arbitration clause . . . were indeed harsh and had operated harshly on exhibitors, as revealed in the Court's statement of the facts, 282 U.S. at 37-41, 51 S.Ct. 42, and further in the Government's brief, see 282 U.S. at 35-36, 51 S.Ct. 42. A further factor which, although not mentioned, must have lurked in the background, was that many of the distributors themselves were important exhibitors and, indeed, were later found to have conspired with the goal of attaining a monopoly in exhibition, see United States v. Paramount Pictures, Inc., 334 U.S. 131, 167-71, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).
 Drayer v. Krasner, supra, 572 F.2d at 354-55.
 First National Pictures dealt with a similar agreement of film distributors to impose a credit check on exhibitors. The agreement allowed a credit committee appointed by the distributors to exact a security deposit from exhibitors with low credit ratings. The Court explained the evil of this combination very briefly:
 The obvious purpose of the arrangement is to restrict the liberty of those who have representatives on the Film Boards and secure their concerted action for the purpose of coercing certain purchasers of theaters by excluding them from the opportunity to deal in a free and untrammeled market.
 282 U.S. at 54, 51 S.Ct. at 48. While this may imply disapproval of joint negotiation by the distributors, it also disapproves the restraint on distributors' freedom to vary the terms of their contracts with exhibitors. The Court may therefore have been concerned about the limitation on competitive variations of substitutable "goods," about the distributors' increased bargaining strength, or both.
 Professor Sullivan comments:
 Arrangements like those in Famous Laskey and First National are more like price fixing agreements than they are like classic boycotts. Indeed, if a concerted agreement, say, to include a security deposit in all contracts is a "boycott" because it excludes all buyers who won't agree to it, then by parity of reasoning every price fixing agreement would be a boycott also. The use of the single concept, boycott, to cover agreements so varied in nature can only add to confusion. But there is an even more important reason for not referring to an agreement which concertedly sets non-price terms of trade as a boycott, to which the per se doctrine applies. Such agreements may not be as consistently adverse to competition as their price fixing agreements or classic boycotts. In some situations for example if there are large numbers of small sellers and buyers an agreement fixing collateral terms, like an agreement standardizing product, might tend to increase price competition by reducing confusing variations between the offerings of competing sellers. In other situations concerted decisions about the terms on which competitors will trade may advance other social objectives and be competitively neutral. Though courts should look at all such arrangements critically, a per se response may be too severe.
 L. Sullivan, supra, at 257-58 (footnote omitted); see also R. Posner, supra, at 207-08.
 In the light of these and related thoughts about the vitality of Paramount Famous Lasky, the Second Circuit held that a collective attempt to impose a standard arbitration clause, which did not "inhibit the freedom of any firm in competing for business or of any investor in seeking the firm that will give him the best and cheapest service," Drayer v. Krasner, supra, 572 F.2d at 354, was "within the rule of reason," id. at 355. Thus one circuit, at least, is unwilling to extrapolate from Paramount Famous Lasky even to all concerted efforts to impose arbitration clauses, to say nothing of other forms of joint negotiation.